# GARY F. PARSONS ET AL. *v.* UNITED TECHNOLOGIES CORPORATION, SIKORSKY AIRCRAFT DIVISION, ET AL.
## (SC 15570)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued February 18—officially released September 2, 1997

*John R. Logan*, with whom was *Joel D. Perlotto*, for the appellant (named plaintiff).

*Edward J. Dempsey*, for the appellees (defendants).

*Opinion*

NORCOTT, J. The issue in this appeal is whether the named plaintiff, Gary F. Parsons,[1] a former at-will employee of the named defendant, Sikorsky Aircraft Division of United Technologies Corporation,[2] sufficiently alleged a cause of action against the defendant for wrongful discharge, intentional infliction of emotional distress, or negligent infliction of emotional distress based on the defendant's termination of the plaintiff's employment. The trial court, *Levin, J.*, granted the defendant's motion to strike each of these counts, which constituted the entirety of the plaintiff's complaint, and rendered judgment for the defendant.[3] This appeal followed.[4]

---

[1] In addition to Gary F. Parsons, his wife, Donna H. Parsons, and daughter, Noel Parsons, were originally plaintiffs in this proceeding. In response to the defendants' request to revise, however, they were dropped as parties following the named plaintiff's fifth amended revised complaint. Accordingly, only Gary F. Parsons remains a plaintiff at this stage in the litigation, and is referred to hereafter as the plaintiff.

[2] In addition to the named defendant, Robert H. Osborn, an employee of the Sikorsky Aircraft Division of United Technologies Corporation and the plaintiff's former supervisor, was originally a defendant in this proceeding. The plaintiff's fifth amended complaint dropped Osborn as a defendant. Hereafter, we refer to Sikorsky Aircraft Division of United Technologies Corporation as the defendant.

[3] See part I A of this opinion for a more detailed procedural history of this case.

[4] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, the plaintiff claims that the trial court acted improperly in striking each of the three claims of his complaint. We reverse the trial court's judgment striking count one, and we affirm the judgment striking counts two and three of the complaint.

"In an appeal from a judgment following the granting of a motion to strike, we must take as true the facts alleged in the plaintiff's complaint and must construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Sassone* v. *Lepore*, 226 Conn. 773, 780, 629 A.2d 357 (1993); *Michaud* v. *Wawruck*, 209 Conn. 407, 408, 551 A.2d 738 (1988)." *Waters* v. *Autuori*, 236 Conn. 820, 822, 676 A.2d 357 (1996). A motion to strike admits all facts well pleaded. See Practice Book § 152. A determination regarding the legal sufficiency of a claim is, therefore, a conclusion of law, not a finding of fact. Accordingly, our review is plenary. *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997).

We assume as true the following facts as alleged in the plaintiff's seventh revised amended complaint. The defendant is a corporation engaged in the business of manufacturing, distributing and servicing helicopters and other related products. The plaintiff had been employed by the defendant, on an at-will basis, as an instructor of aircraft maintenance since August 29, 1986, during which time he had been a member of a project team that had built a nonmilitary helicopter for the Crown Prince of Bahrain.[5] On September 11, 1990, the plaintiff's supervisor assigned the plaintiff to

[5] Bahrain is an independent sheikhdom consisting of several islands in the Persian Gulf. It is situated approximately thirteen miles east of Saudi Arabia. Bahrain has an area of 231 square miles. Its principal island, also called Bahrain, is thirty miles long and twelve miles wide. Its capital, Manamah, is at the northeast end of Bahrain Island. 3 Encyclopedia Americana (1994) p. 59.

instruct several members of a Bahrain helicopter crew regarding the proper repair and maintenance of the helicopter. On September 12, 1990, the plaintiff was informed that he would have to provide this training at the "Headquarters, Bahrain Defense Force," beginning September 20, 1990. The plaintiff alleged further that this assignment would require him to "sleep and eat" and "resid[e]" at the Bahrain military base.

The plaintiff also alleged that at this time the United States of America and certain allied nations, including Bahrain, were involved in a joint military action, known as Operation Desert Shield, taken in response to the Iraqi invasion of Kuwait. The military installation to which the plaintiff was to be sent was serving as the main staging area for the allied warplanes that were based on Bahrain. On September 13, 1990, the plaintiff became aware of a travel advisory issued by the United States Department of State (State Department), which was in force throughout the relevant period and provided in part: "Due to the Iraqi military invasion of Kuwait and continuing unstable conditions in the region, the Department of State advises all Americans to defer all non-essential travel to . . . Bahrain . . . ."[6]

---

[6] The State Department, Bureau of Consular Affairs, travel advisory provided:

"Persian Gulf (Including Qatar, Bahrain, the United Arab Emirates, and the eastern province of Saudi Arabia)—WARNING

"August 16, 1990

"This replaces the previous advisory, dated August 7, 1990.

"Due to the Iraqi military invasion of Kuwait and continuing unstable conditions in the region, the Department of State advises all Americans to defer all non-essential travel to the eastern province of Saudi Arabia, and to Qatar, Bahrain, and the United Arab Emirates. The Department is permitting dependents of U.S. government officials to depart the area on a voluntary basis. The Department of State advises other American citizens in the area to consider doing the same. Note that this advisory applies only to the eastern province, not the rest of Saudi Arabia.

"Expiration: Indefinite."

On September 18, 1990, the plaintiff informed the defendant by written memo that he refused to travel to Bahrain because of the perceived threat to his health, safety and welfare, evidenced in part by the State Department travel advisory and in part by news reports about the situation in the Persian Gulf region generally. Within two hours of the plaintiff's refusal, the defendant terminated the plaintiff's employment and removed him from the building under security escort.

I

The plaintiff first claims that the trial court improperly struck the first count of his seventh revised amended complaint, which asserted a wrongful termination claim. Although conceding that he was an at-will employee, the plaintiff argues that his discharge for refusal to travel to Bahrain violated Connecticut public policy requiring an employer to provide its employees with a reasonably safe place to work, as demonstrated by several state statutes regulating workplace safety.[7] The trial court granted the defendant's motion to strike this claim on independent procedural and substantive grounds. We disagree both with the trial court's procedural analysis and with its conclusion that the plaintiff failed to state a legally sufficient claim for wrongful termination.

A

The first ground upon which the trial court struck the plaintiff's wrongful termination count was procedural. The court concluded that the plaintiff's wrongful termination claim in his seventh revised complaint was substantially the same as the wrongful termination claim that the plaintiff had previously made in his fifth revised complaint. Because that prior count had itself been stricken for failure to state a legally sufficient claim,

---

[7] See footnote 14 and part I B of this opinion.

and because the plaintiff had not appealed from the merits of that decision but had instead opted to replead, the court concluded that the same claim in his seventh revised complaint should be stricken as well.

The following additional procedural history is relevant to the resolution of this issue. The plaintiff's complaint has undergone many revisions during the life of this case. The fifth revised amended complaint was filed on September 16, 1993. The factual allegations underlying the wrongful termination count therein were almost identical to the factual allegations made in the seventh revised amended complaint, as set forth previously in this opinion. The sole difference between the two revisions is that, whereas the seventh revision of the complaint specifies that the plaintiff was to be sent to "Headquarters, Bahrain Defense Force," a staging ground for allied warplanes during Operation Desert Shield, the fifth revision of the complaint merely stated that the plaintiff was to be sent to Bahrain.[8] Thus, in the fifth revised amended complaint, the plaintiff's allegation was that the entire country of Bahrain was an unsafe workplace on account of the escalating Persian Gulf conflict, which had the effect of rendering the whole region generally perilous.

---

[8] The only differences in the factual allegations made in the fifth and seventh revisions of the complaints are contained in paragraph six. In the fifth revised amended complaint, paragraph six alleged in relevant part: "[On] September 12, 1990, [the plaintiff] was told by [his supervisor] that [the plaintiff] would be required to travel to Bahrain on or about September 20, 1990, in order to implement the repair and maintenance program to the Bahrain crew . . . ." Conversely, in the seventh revised amended complaint, paragraph six alleges in relevant part: "[On] September 12, 1990, [the plaintiff] was told by [his supervisor] that [the plaintiff] would . . . be required to travel to *the 'Headquarters, Bahrain Defense Force,' a military installation located near the capital city, and the main staging area for Allied warplanes on the island of Bahrain,* on or about September 20, 1990, [*The plaintiff*] *was to give instruction, sleep and eat all his meals at this one installation* in order to implement the repair and maintenance program to the Bahrain crew. . . ." (Emphasis added.)

The trial court, *Ford, J.*, granted the defendant's motion to strike the wrongful termination count from the plaintiff's fifth revised complaint. The court held that, even assuming that Connecticut does recognize a public policy that requires employers to provide employees with a reasonably safe workplace, such a policy would only cover situations where employers had "possession or control over a definable 'workplace' or 'place of employment' . . . . Expanding the definition of work place or place of employment to include a whole country [would be] beyond" the scope of the policy. The court concluded that, because the plaintiff had not "allege[d] that [the defendant] owned, operated, or managed a 'workplace' or 'place of employment' in Bahrain," but rather had "allege[d] that all of Bahrain, as a sovereign and autonomous nation, was unsafe at the time of his proposed work assignment," the plaintiff's claim was legally insufficient.

The plaintiff subsequently filed notice, pursuant to then Practice Book § 4002,[9] reserving an appeal with

---

[9] At the time the reservation was filed, Practice Book § 4002 provided: "Appeal from Judgment Disposing of Part of Issues

"(a) A judgment pursuant to subsections (b) or (c) of this rule that disposes of certain of the issues between the parties or of part or all of the issues between some of them may be treated as a final judgment for the purpose of an appeal by the party or parties against whom the judgment is rendered notwithstanding that the cause remains undisposed of on other issues or as to other parties. Alternatively, the party or parties may reserve their appeal until the final judgment is rendered which disposes of the cause for all purposes and as respects all parties; provided, in such a case, that notice of such reserving of appeal shall be filed in the trial court accompanied by a certification that a copy thereof has been served on each counsel of record in accordance with the provisions of Sec. 4014 within twenty days after issuance of notice of the rendition of the judgment disposing of part of the issues.

"(b) When an entire complaint, counterclaim or cross complaint has been stricken, the trial court may, pursuant to Sec. 157, render judgment on such stricken complaint, counterclaim or cross complaint.

"When fewer than all of the counts of a complaint, counterclaim or cross complaint have been stricken, the trial court may, upon motion pursuant to this subsection, render judgment upon such stricken counts if (1) such

respect to the granting of this motion to strike. Rather than proceeding with the remaining count of his complaint,[10] however, the plaintiff filed yet another revision of his complaint in which, despite his reservation, he repleaded his wrongful termination claim, adding the allegations regarding the specific location in Bahrain to which he was to have been sent.

In response to the seventh revised amended complaint,[11] the defendant filed a motion to strike the plaintiff's wrongful termination claim, based in part on its contention that the plaintiff's revised claim was substantively identical to the claim that had already been stricken by Judge Ford. Judge Levin agreed with this

counts are directed against a party against whom no relief is sought in the remaining counts of such pleading, or (2) the parties consent to entry of judgment and the trial court makes a written finding or written determination that the issues involved in the stricken counts are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified. A party entitled to appeal from such judgment may appeal regardless of which party moved for the judgment to be made final.

"(c) When a motion to dismiss pursuant to Sec. 142 or a summary judgment pursuant to Sec. 378 has been granted upon an entire complaint, counterclaim or cross complaint, such dismissal or summary judgment shall constitute a final judgment.

"When fewer than all of the counts of a complaint, counterclaim or cross complaint have been dismissed, or when summary judgment has been granted upon fewer than all of the counts of a complaint, counterclaim or cross complaint, such partial dismissal or partial summary judgment shall constitute a final judgment if (1) such counts are directed against a party against whom no relief is sought in the remaining counts of such pleading, or (2) the parties consent to the rendition of judgment and the trial court makes a written finding or written determination that the issues involved in the counts as to which a motion to dismiss or for summary judgment has been granted are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified."

[10] The plaintiff's claim for intentional infliction of emotional distress was also struck from his fifth revised amended complaint. See part II of this opinion. The plaintiff's claim for negligent infliction of emotional distress, however, remained.

[11] The procedural history regarding the intervening sixth amended complaint, which is identical to the seventh amended complaint, is not relevant to the disposition of the issues before us.

contention and granted the defendant's motion. We conclude, however, that the plaintiff's wrongful termination claim should not have been stricken on this ground.

As a general rule, "[t]he filing of an amended pleading operates as a waiver of the right to claim that there was error in the sustaining of the [motion to strike] the original pleading." (Internal quotation marks omitted.) *P & L Properties, Inc.* v. *Schnip Development Corp.*, 35 Conn. App. 46, 49, 643 A.2d 1302, cert. denied, 231 Conn. 913, 648 A.2d 155 (1994); see also *Royce* v. *Westport*, 183 Conn. 177, 179, 439 A.2d 298 (1981); *Good Humor Corp.* v. *Ricciuti*, 160 Conn. 133, 135, 273 A.2d 886 (1970). Therefore, by opting to replead his wrongful termination claim after it was struck from his fifth amended complaint, rather than pursuing his reserved appeal, the plaintiff abandoned his right to claim that the specific allegations in the fifth amended complaint were, in fact, sufficient to support a wrongful termination claim. Accordingly, *if* the allegations in the plaintiff's seventh amended complaint were not materially different than those in his fifth amended complaint, the plaintiff could not now appeal from the merits of the trial court's ruling striking the wrongful termination claim from the seventh amended complaint. *Royce* v. *Westport*, supra, 180–81.

After a review of the relevant pleadings and the memorandum of decision of Judge Ford striking the plaintiff's wrongful termination claim from his fifth amended complaint, we conclude that the additional facts pleaded in the plaintiff's seventh amended complaint do render the allegations sufficiently different from those in the fifth amended complaint to make the waiver rule inapplicable. It is true that the only difference between the two sets of allegations is the addition of the specific location in Bahrain to which the plaintiff was to be sent. This addition, however, addresses the specific defect that the trial court had emphasized in

originally striking the plaintiff's wrongful termination claim from his fifth amended complaint.

In striking that claim from the plaintiff's fifth amended complaint, the court had emphasized the complaint's failure to specify a particular "workplace" or "place of employment" within Bahrain that was allegedly unsafe. The court held that the plaintiff's allegation that the entire nation was generally unsafe was insufficient.[12] Thus, although the plaintiff's subsequent additions to his factual allegations may have been limited, they can fairly be read as attempting to address the specific problem identified by the trial court in striking the plaintiff's original wrongful termination claim.[13] The plaintiff appears to have made a good faith effort to

[12] Specifically, the court reasoned that "[a]n examination of the statutes cited to by the plaintiff reveals that workplace or place of employment is contemplated to mean a physical plant, factory, facility, mill, works, building, or establishment, i.e., places with fixed or definable boundaries and location. . . . The statutes relied upon by the plaintiff [to demonstrate a Connecticut public policy of workplace safety] contemplate that an owner or employer have possession or control over a definable workplace or place of employment in order to provide a reasonably safe environment. . . . The plaintiff fails to allege that [the defendant] owned, operated or managed a workplace or place of employment in Bahrain. Rather, the plaintiff alleges that [the defendant] required him to travel to Bahrain in order to implement a repair and maintenance program to a Bahraini crew. The plaintiff does not allege that the workplace or place of employment in Bahrain was unreasonably unsafe or suffered from some hazardous condition. The plaintiff alleges that all of Bahrain, as a sovereign and autonomous nation, was unsafe at the time of his proposed work assignment. Expanding the definition of work place or place of employment to include a whole country is beyond the contemplation of the statutes. Pursuant to the foregoing the plaintiff fails to plead sufficient facts to place himself within the protection of the public policy." (Citations omitted; internal quotation marks omitted.)

[13] The defendant argues that the decision by Judge Ford; see footnote 12 of this opinion; actually struck the plaintiff's wrongful termination count on *two* grounds. In the defendant's view, the fact that the plaintiff had not alleged that a specific workplace in Bahrain was unsafe was only one of the grounds on which the wrongful termination count was stricken from the fifth amended complaint. A second, independent ground, according to the defendant, was that the plaintiff had not alleged that the defendant *owned* or *operated* an unsafe workplace in Bahrain. The defendant argues,

file a complaint that states a cause of action. We are persuaded, accordingly, that by failing to appeal the striking of the fifth amended complaint, the plaintiff has not waived his right to appeal from the merits of the motion to strike the wrongful termination claim from his seventh amended complaint.

B

The second, independent basis on which the trial court struck the wrongful termination claim from the plaintiff's seventh amended complaint was the court's substantive conclusion that the plaintiff's allegations, even if accepted as true, failed to make out a claim for wrongful termination. We disagree with the trial court's conclusion.

"In *Sheets* v. *Teddy's Frosted Foods, Inc.*, [179 Conn. 471, 480, 427 A.2d 385 (1980)], in an effort to balance the competing interests of employers and employees, we recognized a public policy limitation on the traditional employment at-will doctrine. *Antinerella* v. *Rioux*, 229 Conn. 479, 492, 642 A.2d 699 (1994). In *Sheets*, we sanctioned a common law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety . . . derived from some important violation of public policy. *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, [475]; see *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986); *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 572, 479 A.2d 781 (1984). In *Morris* v. *Hartford Courant Co.*, supra, 680, we recognized the inherent vagueness of the concept of public policy and the

and Judge Levin agreed, that even if the plaintiff had remedied the first defect in his fifth amended complaint by his additional allegations, the second defect remains uncorrected in the seventh amended complaint.

We disagree with the defendant's and the Judge Levin's reading of the memorandum of decision by Judge Ford. Although that memorandum does refer both to the plaintiff's failure to allege a fixed workplace in Bahrain

difficulty encountered when attempting to define precisely the contours of the public policy exception. In evaluating claims, [w]e look to see whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy. . . . *Antinerella* v. *Rioux*, supra, 492, quoting *Morris* v. *Hartford Courant Co.*, supra, 680." (Internal quotation marks omitted.) *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 580–81, 693 A.2d 293 (1997).

In his complaint, the plaintiff sought to establish, by reference to several state statutes concerning workplace safety, that Connecticut has a general public policy requiring each employer to provide its employees with a reasonably safe workplace.[14] The main statutes upon which the plaintiff relied are General Statutes §§ 31-49 and 31-370. Section 31-49 provides in relevant part that "[i]t shall be the duty of the master to exercise

and to his failure to allege any control by the defendant over a Bahrain workplace, the discussion is clearly focused, and the decision based, upon the former point and not the latter. See footnote 12 of this opinion.

[14] The plaintiff alleges that the safe workplace public policy is further advanced by the following statutes: General Statutes § 16a-100 (establishing atomic energy policy); General Statutes § 29-307a (prohibiting hazardous materials); General Statutes § 29-390 (requiring factory fire escapes); General Statutes § 29-408 (requiring safety measures to be provided); General Statutes § 31-10 (establishing appointment of safety inspectors); General Statutes § 31-24 (prohibiting hazardous employment of children); General Statutes § 31-38a (requiring sanitary, lighting and heating facilities for railroad employees); General Statutes § 31-40c (setting forth safety procedures for carcinogens used in workplace); General Statutes § 31-40g (prohibiting substance hazardous to reproductive systems); General Statutes § 31-40j et seq. (prohibiting toxic substances in workplace); General Statutes § 31-40q (limiting smoking in workplace); General Statutes § 31-40t (establishing employees' right to act in case of hazardous conditions); General Statutes § 31-45a (delineating authority of labor commissioner to establish regulations regarding protection of feet); General Statutes § 31-46 (establishing safety regulations for workers in building operations); General Statutes § 31-51d (delineating labor commissioner's powers and duties); General Statutes § 31-51x (establishing drug testing).

reasonable care to provide for his servant a reasonably safe place in which to work . . . ."[15] Section 31-370 provides in relevant part that "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. . . ."[16] The plaintiff alleged that his termination for refusing to travel to the Headquarters, Bahrain Defense Force, was wrongful because his refusal to work there was in accordance with this public policy.

In dismissing the plaintiff's seventh revised amended complaint, the trial court, concluded that "[a]ssuming that these statutes create a clear mandate of public policy, that policy would require an employer who owns, controls or maintains a workplace within Connecticut to abate certain safety violations and hazard-

---

[15] General Statutes § 31-49 provides: "Care required of a master for his servant's safety. It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work and fit and competent persons as his colaborers and to exercise reasonable care in the appointment or designation of a vice-principal and to appoint as such vice-principal a fit and competent person. The default of a vice-principal in the performance of any duty imposed by law on the master shall be the default of the master."

[16] General Statutes § 31-370 provides: "Duties of employer and employee. (a) Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

"(b) Each employer shall, upon the written request of any employee, furnish such employee with a written statement listing the substances which such employee uses or with which such employee comes into contact that have been identified as toxic and hazardous by occupational safety and health standards, under Title 29 CFR 1910.1000 'Air Contaminant Code of Federal Regulations.'

"(c) Each employer shall comply with occupational safety and health standards promulgated under this chapter.

"(d) Each employee shall comply with occupational safety and health standards and all regulations and orders issued pursuant to this chapter which are applicable to his own actions and conduct."

ous conditions, and provide a reasonably safe 'Connecticut workplace' for its employees. . . . Reading the allegations of the complaint in the light most favorable to the pleader, the plaintiff fails to allege that [the defendant] owned, controlled or maintained a workplace in Bahrain. Even assuming arguendo that [the defendant] did so, the statutes cited by the plaintiff do not express a public policy which would prohibit an employer from requiring an employee to travel to a foreign country where there may be some type of instability or military threat." We disagree.

As a preliminary matter, we note our adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one that is only to be invoked when " 'the reason for [the employee's] discharge . . . involves impropriety derived from some important violation of a public policy.' " *Carbone* v. *Atlantic Richfield Co.*, 204 Conn. 460, 470, 528 A.2d 1137 (1987). We are "mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 477. Nevertheless, "when there is a relevant state statute we should not ignore the statement of public policy that it represents." Id., 480.

As a result of our careful review of the language, history, and public policy underlying the statutory provisions cited by the plaintiff in support of his claim, we conclude that this body of law expresses a clear and defined public policy requiring an employer who conducts business in Connecticut to provide a reasonably safe workplace to its employees. We note, for example, that although § 31-49 was originally codified in 1902, the legislature has not repealed it despite the subsequent enactment of other statutes, such as the Workers' Compensation Act, which regulate safety in the workplace.

See *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 494 A.2d 555 (1985). The legislature also enacted § 31-370, which is part of the Connecticut Occupational Safety and Health Act, to regulate safety in the workplace. Both §§ 31-49 and 31-370 reflect a broad legislative concern for the physical welfare and safety of Connecticut employees. Consequently, we are persuaded that the mandate of public policy that these statutes embody gives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm and that are not contemplated within the scope of the employee's duties.[17]

In recognizing this public policy exception to the employment-at-will doctrine, we find company with other jurisdictions. See *Hentzel* v. *Singer Co.* 138 Cal. App. 3d 290, 298, 188 Cal. Rptr. 159 (1982) ("[i]t requires little analysis to perceive that the legislative purpose underlying these provisions would be substantially undermined if employers were permitted to discharge employees simply for protesting working conditions which they reasonably believe constitute a hazard to their own health or safety"); *Wheeler* v. *Caterpillar Tractor Co.*, 108 Ill. 2d 502, 511, 485 N.E.2d 372 (1985) ("[t]he protection of the lives and property of citizens from . . . hazards . . . is as important and fundamental as protecting them from crimes of violence");

---

[17] We acknowledge that some types of employment have inherent risks that the employee assumes in accepting such employment. For example, a security guard who is an at-will employee and who is terminated for refusing to guard a building located in a high crime neighborhood could not claim that he was discharged wrongfully in violation of the safe workplace public policy. Similarly, a news reporter in Connecticut who regularly covered the Middle East region could not use the safe workplace exception as a shield against his or her news station employer if he or she refused to travel to the Persian Gulf during Operation Desert Shield.

*D'Angelo* v. *Gardner*, 107 Nev. 704, 718, 819 P.2d 206 (1991) ("it is violative of public policy for an employer to dismiss an employee for refusing to work under conditions unreasonably dangerous to the employee"); see also *Wilcox* v. *Niagara of Wisconsin Paper Corp.*, 965 F.2d 355, 358 (7th Cir. 1992) (employee with heart condition could maintain wrongful discharge claim under Wisconsin public policy where allegedly discharged for refusing to work on weekend when he had worked more than thirty-five hours over preceding two days); *Paige* v. *Henry J. Kaiser Co.*, 826 F.2d 857, 862 (9th Cir. 1987) (employees could maintain wrongful discharge claim under California public policy where allegedly discharged for refusing to refuel unsafe generator).

We do not find support for the trial court's conclusion that, even if the relevant statutes do establish a public policy requiring employers to provide a safe workplace, the policy only applies to a workplace that is: (1) located in Connecticut; and (2) controlled, maintained, or owned by the employer. Such a narrow conception of a safe workplace ignores both the underlying purposes of the statutes upon which the public policy of workplace safety is predicated as well as the modern day realities of our global economy and increasingly mobile society. "Section 31-49 is applicable wherever the master-servant relationship exists . . . ." *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, supra, 196 Conn. 545. Moreover, pursuant to General Statutes § 31-369, the duties of employers to provide safe workplaces under § 31-370 "applies to *all employers, employees* and places of employment in the state . . . ." (Emphasis added.) By concluding that the safe workplace public policy, which is premised partly on § 31-370, applies only to work sites in Connecticut, the trial court overlooked the fact that, in addition to work sites in Connecticut, § 31-370 applies to *employers* and *employees*

in the state. Consequently, an employer in the state who sends one of its employees in the state to an unsafe work site fails to comply with the mandate of that statute. Finally, we have held that "[t]he remedial purpose of [the Connecticut] Workers' Compensation Act supports application of its provisions in cases where an injured employee seeks an award of benefits and Connecticut is the place of injury, the *place of employment contract or the place of the employment relation*." (Emphasis added.) *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 195, 588 A.2d 194 (1991).

Rather than expressing a safe workplace requirement that is limited to the confines of the state and to a work site exclusively controlled by the employer, these statutes simply and firmly prohibit employers who conduct business in Connecticut from exposing their employees to known hazards while they are performing their duties. A Connecticut employer is not relieved of the obligation to provide a safe workplace to its employees because that employer decides to send an employee to a work site outside Connecticut over which the employer has no control. The only relevant inquiry is whether the employer directed the employee to work in a place or condition that poses an objectively substantial risk of death, disease or serious bodily injury to the employee.

Having established the contours of this public policy exception to the doctrine of employment-at-will, we turn to the allegations in the plaintiff's seventh revised amended complaint to determine whether the plaintiff properly alleged facts sufficient to state that his discharge constituted a wrongful termination in violation of the safe workplace public policy. We do so mindful of the well settled law regarding pleadings. "The interpretation of pleadings is always a question for the court . . . ." (Citation omitted; internal quotation marks omitted.) *Cahill* v. *Board of Education*, 198 Conn. 229,

236, 502 A.2d 410 (1985). "The modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 587–88, 542 A.2d 1124 (1988), and cases cited therein. Although essential allegations may not be supplied by conjecture or remote implication; *Cahill* v. *Board of Education*, supra, 236; the complaint must be read in its entirety in such a way as to "give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." *Price* v. *Bouteiller*, 79 Conn. 255, 257, 64 A. 227 (1906). "As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 496, 646 A.2d 1289 (1994); *Tedesco* v. *Stamford*, 215 Conn. 450, 459, 576 A.2d 1273 (1990), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992); *Giulietti* v. *Connecticut Ins. Placement Facility*, 205 Conn. 424, 434, 534 A.2d 213 (1987).

The plaintiff's complaint does not set forth the exact place, time, and type of danger to which the plaintiff would be exposed while he was stationed at the Headquarters, Bahrain Defense Force. The plaintiff did state, however, that the proposed place of the plaintiff's employment, a staging ground for allied air attacks against Iraq, was in fact a significant danger zone posing a "threat of imminent danger, and risk to [the plaintiff's] personal safety, health and welfare . . . ." The plaintiff's complaint also included a travel advisory issued by the State Department, the arm of the national government charged with the nation's conduct in foreign affairs. *Ex parte Republic of Peru*, 318 U.S. 578, 588,

63 S. Ct. 793, 87 L. Ed. 1014 (1943). The travel advisory advised "all Americans to defer all non-essential travel to the eastern province of Saudi Arabia, and to Qatar, Bahrain, and the United Arab Emirates" because of the Iraqi military invasion of Kuwait and continuing unstable conditions in the region. At the time of the issuance, there were three types of State Department travel advisories—warning, caution, and notice. "[1] WARNING—recommends deferral of travel to all or part of a country; [2] CAUTION—advises about unusual security conditions, including the potential for unexpected detention, unstable political conditions or serious health problems (not intended to deter travel to a country); [3] NOTICE—provides information on situations that do not present a broad-scale risk, but which could result in inconvenience or difficulty for traveling Americans." United States Department of State, Bureau of Consular Affairs, "Your Passport To a Safe Trip Abroad," p. 22. The travel advisory upon which the plaintiff relied was, at that time, the highest level of warning issued by the State Department and was, indeed, the sole level of travel advisory aimed at actually deterring travel.

The August 16, 1990 warning recited in the complaint was issued as a replacement for the previous advisory issued on August 7, 1990. Although we do not have a copy of that advisory in the record or the court file, the relevant state of events had changed dramatically between the two dates.[18] On August 7, 1990, United

[18] We take judicial notice of these events, the occurrence of which is undisputed. "To take judicial notice is a function, and to apply it to the decision of causes a right, which appertains to every court of justice, from the lowest to the highest. *Arthur* v. *Norfield Congregational Church*, 73 Conn. 718, 731, 49 A. 241 [1901]; *Masline* v. *New York, N. H. & H. R. Co.*, 95 Conn. 702, 709, 112 A. 639 [1921]." *State* v. *Tomanelli*, 153 Conn. 365, 368, 216 A.2d 625 (1966). "A court may take judicial notice of all matters that are (1) within the knowledge of people generally in the ordinary course of human experience; *Nichols* v. *Nichols*, 126 Conn. 614, 620, 13 A.2d 591 (1940); or (2) generally accepted as true and capable of ready and unquestion-

States President George Bush ordered thousands of paratroopers, an armored brigade and jet fighters to Saudi Arabia. The deployment, along with tight economic sanctions, was part of a two-pronged international assault in reaction to Iraq's occupation of Kuwait. A. Rosenthal, "Bush Sends U.S. Force To Saudi Arabia As Kingdom Agrees To Confront Iraq," N.Y. Times, August 8, 1990, p. A1. By August 11, 1990, the majority of countries in the Arab League voted to send troops to Saudi Arabia to help defend against a possible Iraqi invasion , and United States officials represented that as many as 100,000 United States troops could be committed for duty in Saudi Arabia. J. Kifner, "Arabs Vote To Send Troops To Help Saudis; Boycott Of Iraqi Oil Is Reported Near 100%," N.Y. Times, August 11, 1990, p. A1; R. Apple, Jr., "U.S. Says Its Troops in the Gulf Could Reach 100,000 in Months," N.Y. Times, August 11, 1990, p. A1. Indeed, one newspaper article reported that a plane landed in Saudi Arabia every ten minutes with American troops and equipment. "Every 10 Minutes, a Landing By U.S. Planes at Saudi Base," N.Y. Times, August 14, 1990, p. A11. As a result, the State Department determined that the level of danger to travelers had escalated in Bahrain, as well as in other countries in the region, to such an extent that the most extreme warning then available was implemented.

Under these circumstances, common sense and human experience dictate that the plaintiff's assignment to Headquarters, Bahrain Defense Force, to teach repair and maintenance of a nonmilitary helicopter for the Crown Prince of Bahrain, could pose a significant threat to the plaintiff's safety and welfare. The State Department travel advisory, coupled with the widely known perilous situation in the Persian Gulf at the time of the plaintiff's discharge, leads us to conclude that the

able demonstration, *State* v. *Tomanelli*, [supra, 369]." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.2.1, p. 120.

plaintiff's complaint clearly alleged facts that, taken as a whole and considered in the light most favorable to the plaintiff, are sufficient to establish that the plaintiff was terminated for refusing to follow an employer's directive that would have posed a serious threat to the plaintiff's health and safety and that was not contemplated within the scope of his employment duties.

We emphasize that, in recognizing a public policy requiring an employer to provide a safe workplace for its employees, and in reinstating the first count of the plaintiff's seventh revised amended complaint alleging wrongful discharge in violation of that safe workplace public policy, we are *not* holding that an at-will employee can contest his or her discharge based on a *subjective* belief that an employer's directive would pose a threat to the employee's health and safety. It remains the burden of the employee who contests his or her discharge as a violation of the safe workplace public policy to prove that the condition or situation in which the employee was directed to work posed an objectively substantial risk of death, disease or serious physical harm. Similarly, although we do conclude that the plaintiff has carried his burden of *pleading* that he was discharged in violation of the safe workplace public policy, we do not hold that the plaintiff has carried his burden of *proving* either that his discharge was based on the defendant's violation of the safe workplace public policy, or that his proposed relocation was not contemplated within the scope of his duties as an employee of the defendant. We conclude only that, given the widely known perilous state of the Persian Gulf region at the time of the plaintiff's discharge, along with our mandate that pleadings be construed broadly rather than narrowly, the allegations presented in the plaintiff's seventh revised amended complaint are sufficient to make out a claim that the plaintiff was wrongfully

discharged in violation of the public policy requiring employers to provide a safe workplace.

## II

The plaintiff next claims that the trial court improperly struck the second count of his complaint, which asserted a claim for intentional infliction of emotional distress based on the circumstances of the plaintiff's termination. We agree with the defendant and the trial court that the plaintiff has waived his right to raise this issue on appeal.

As with the plaintiff's wrongful termination claim, the plaintiff's claim for intentional infliction of emotional distress was struck by Judge Ford from the plaintiff's fifth amended complaint. See part I A of this opinion. The court struck this claim on the ground that "[t]he allegations of the plaintiff's complaint are insufficient to demonstrate extreme and outrageous conduct on the part of" the defendant in its handling of the termination of the plaintiff's employment. Although the plaintiff reserved an appeal on this issue pursuant to then Practice Book § 4002; see footnote 9; he chose, as with the wrongful termination claim, to replead the count instead. In response to this repleading, the defendant filed another motion to strike the plaintiff's intentional infliction of emotional distress claim, based in part on its contention that the plaintiff's revised claim was substantively identical to the claim that had already been stricken. Judge Levin agreed, and granted the defendant's motion. We agree with the trial court.

As discussed in part I A of this opinion, the only additional facts pleaded by the plaintiff in his seventh revised amended complaint that were not in the fifth revised amended concerned the specific location in Bahrain to which he was to be sent. Although these

additional allegations sufficiently addressed the deficiency identified by the trial court in striking the wrongful termination claim from the plaintiff's fifth revised amended complaint; see part I A of this opinion; they did not address the trial court's basis for striking the plaintiff's intentional infliction of emotional distress claim. Thus, with regard to that claim, the seventh revised amended complaint is not materially different from the fifth revised amended complaint. Accordingly, for the reasons given in part I A of this opinion, the plaintiff has waived his right to appeal the striking of his claim for intentional infliction of emotional distress.

### III

The plaintiff's final contention is that the trial court improperly struck the third count of his seventh revised amended complaint, which asserted a claim for negligent infliction of emotional distress based on the circumstances of his termination. We agree with the trial court.

We first recognized a cause of action for negligent infliction of emotional distress in *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). We concluded, however, that in order to state such a claim, the plaintiff has the burden of pleading that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Id.; see also *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 683–84; 2 Restatement (Second), Torts § 313 (1965). Accordingly, negligent infliction of emotional distress in the employment context arises only where it is "based upon unreasonable conduct of the defendant in the termination process." *Morris* v. *Hartford Courant Co.*, supra, 682. The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough

to sustain a claim for negligent infliction of emotional distress. "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Madani* v. *Kendall Ford, Inc.*, 312 Or. 198, 204, 818 P.2d 930 (1991).

Very few courts have addressed the requirements of a claim for negligent infliction of emotional distress within the context of an employment relationship as a whole, much less in the context of the termination of such a relationship. See, e.g., L. Postic, Wrongful Termination: A State-by-State Survey (1994) pp. xvi–xvii. Nonetheless, despite the lack of specific guidance, we are persuaded that the actions that the defendant took in terminating the employment of the plaintiff, as alleged in his complaint, were not so unreasonable as to support a cause of action for negligent infliction of emotional distress. As the trial court observed in granting the defendant's motion to strike, "the defendant was not required to suffer a waiting period in excess of two hours before terminating the plaintiff's employment [because] the plaintiff was an at-will employee [and thus] his employment could be terminated at any time." Moreover, it is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort. *Toth* v. *Square D Co.*, 712 F. Sup. 1231, 1238 (D.S.C. 1989) (not unreasonable for employer to escort former employee off premises after termination of employment, and such action does not provide basis for intentional infliction of emotional distress claim).

The judgment is reversed as to count one of the plaintiff's seventh revised amended complaint and affirmed as to counts two and three of that complaint, and the case is remanded for further proceedings according to law.

In this opinion KATZ, J., concurred, BORDEN, J., with whom CALLAHAN, C. J., joined, concurred as to

parts I A, II and III, and BERDON, J., concurred as to part I.

BORDEN, J., with whom CALLAHAN, C. J., joins, concurring and dissenting. I agree with and join parts I A, II and III of the majority opinion. Thus, I agree that: (1) the plaintiff did not waive his right to appeal from the granting of the motion to strike the wrongful termination count of his seventh revised amended complaint; (2) the plaintiff did waive his right to appeal from the granting of the motion to strike the intentional infliction of emotional distress count of his complaint; and (3) the plaintiff failed to state a sufficient cause of action for negligent infliction of emotional distress based on the circumstances of his termination. With regard to part I B of the majority opinion, however, I disagree that the allegations of the first count of the plaintiff's seventh revised amended complaint, read broadly in favor of sustaining their legal sufficiency, are sufficient to state a claim for wrongful termination of an at-will employment relationship.

I agree with the majority that an at-will employee may not be discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm that is not contemplated within the scope of the employee's duties. I also agree that this policy is not necessarily confined to Connecticut workplaces or to workplaces under the employer's direct control. In my view, however, the plaintiff's complaint has fallen short of alleging sufficient facts to bring his termination within this policy.

The fundamental problem with the majority opinion is that it has stretched beyond the breaking point the principle that pleadings are to be read broadly and realistically, rather than narrowly and technically. *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 587–88, 542 A.2d 1124 (1988). Instead, the majority has supplied

essential allegations " 'by conjecture or remote implication' "; *Cahill* v. *Board of Education*, 198 Conn. 229, 236, 502 A.2d 410 (1985); and has gone far beyond the general theory upon which the complaint proceeded. *Price* v. *Bouteiller*, 79 Conn. 255, 257, 64 A. 227 (1906).

The relevant allegations in the plaintiff's complaint regarding the lack of safety of his proposed workplace are as follows: (1) Bahrain as a nation was involved in, and geographically proximate to, the then developing Persian Gulf conflict;[1] (2) the Headquarters, Bahrain Defense Force, was being used as the main staging ground for Allied forces on the island of Bahrain; and (3) on account of these facts, and as evidenced by the travel advisory of the United States Department of State (State Department) and certain unspecified media reports, assignment to the Headquarters, Bahrain Defense Force, posed a "threat of imminent danger, and risk to [the plaintiff's] personal safety, health and welfare . . . ."

In my view, these allegations are insufficient to establish that the Headquarters, Bahrain Defense Force, was unsafe within the meaning of the safe workplace public policy. In order to maintain the viability of the employment-at-will doctrine and avoid overwhelming the rule with the exceptions, it is important that we not read allegations claiming public policy exemptions overbroadly. "We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 477, 427 A.2d

---

[1] It must be kept in mind that, in September, 1990, when the plaintiff was terminated for refusal to go to Bahrain, Operation Desert Shield, which was the Allied preparatory response to Iraq's invasion of Kuwait, designed to deter a further invasion of Saudi Arabia, was in effect. Operation Desert Storm, which was the onset of actual military operations against Iraq, did not begin until January, 1991.

385 (1980). Bearing this in mind, and reading the plain-
tiff's allegations with reasonable—but not limitless—
generosity, I conclude that the plaintiff has failed to
bring himself within the protection of the safe work-
place public policy.

I first note that I have found no case in which a
wrongful termination claim was predicated upon a gen-
eralized claim, such as the plaintiff makes here, that
surrounding circumstances rendered a workplace
unsafe. See generally L. Postic, Wrongful Termination:
A State-by-State Survey (1994) (collecting public policy
exceptions to at-will employment rules from each
state). Even in those jurisdictions that have recognized
a workplace safety public policy, successful wrongful
termination claims based on a violation of this policy
have always involved specific, clearly delineated threats
to the employee's health and safety.[2] The plaintiff's con-
cerns regarding ambient dangers in Bahrain do not rise
to the level of specificity that has generally been
required to state a cause of action for wrongful dis-
charge in violation of a public policy of workplace
safety.

Turning to the plaintiff's actual allegations in this
case, I believe that they are deficient in a number of

[2] See, e.g., *Wilcox* v. *Niagara of Wisconsin Paper Corp.*, 965 F.2d 355,
358 (7th Cir. 1992) (employee with heart condition could maintain wrongful
discharge claim under Wisconsin public policy where allegedly discharged
for refusing to work on weekend when he had worked thirty-five hours
over preceding two days); *Paige* v. *Henry J. Kaiser Co.*, 826 F.2d 857, 862
(9th Cir. 1987) (employees could maintain wrongful discharge claim under
California public policy where allegedly discharged for refusing to refuel
unsafe generator); *D'Angelo* v. *Garner*, 107 Nev. 704, 718, 819 P.2d 206 (1991)
(actionable violation of public policy to discharge at-will employee with
open surgical wound for refusing to work in cyanide leach pit, where such
work involved "clear danger" to employee); *Todd* v. *Frank's Tong Service,
Inc.*, 784 P.2d 47, 50 (Okla. 1989) (employee could maintain wrongful dis-
charge claim where allegedly discharged for refusing to drive truck that
failed to conform to state safety regulations); see generally J. McCarthy,
Recovery of Damages for Wrongful Discharge (2d Ed. 1990 & Sup. 1996)
§ 1.19.

ways.[3] For example, the plaintiff has failed to allege sufficient specific facts to indicate that the country of Bahrain *as a whole* was unsafe. It is true that the plaintiff cites to general news reports of "increased terrorist activities" in the "proposed area of travel . . . ." Such generalized allegations, however, covering the entire Persian Gulf region and lacking in any specific information about the situation within Bahrain itself, do not establish that the nation of Bahrain was itself unsafe within the meaning of the public policy exception. There are no allegations regarding any precise events, either in the immediate past or definite future, that would have posed a definite threat to the plaintiff's health or safety had he traveled to Bahrain.

Similarly, the plaintiff failed to allege sufficient facts to indicate that the Headquarters, Bahrain Defense Force, *in particular* was unsafe. As with the previous point, the plaintiff's allegations of danger are not particular enough. Although the plaintiff asserts that the headquarters was the "main staging area for Allied warplanes on the island of Bahrain," he fails to allege any *specific* factual consequences of this situation that demonstrate that the headquarters was an unsafe workplace. Indeed, neither the plaintiff nor the majority has suggested what the presumably military term "staging area" means, or what it meant in the context of Operation Desert Shield. I certainly do not pretend to know what it means or meant, and I doubt that the majority knows, either. I do know, however, that there is nothing in this record or in my—or the majority's—limited knowledge of military

---

[3] I do not know which, if any, of the following points, if fully addressed in the plaintiff's complaint, would have been sufficient to allow the complaint to survive the defendant's motion to strike, or even whether the complaint could have survived if all of them were present. In the absence of *any* of them, however, I do not believe that the plaintiff's wrongful termination claim can stand.

94

affairs to support the majority's assertion that the plaintiff "state[d] . . . that the proposed place of the plaintiff's employment [was] *a staging ground for allied air attacks against Iraq* . . . ." (Emphasis added.) The plaintiff's allegation that "Headquarters, Bahrain Defense Force," was the "main staging area for Allied warplanes on the island of Bahrain" does not, without more, translate into an allegation that in September, 1990, the "Allied warplanes on the island of Bahrain" were in fact going to take off from Bahrain to attack Iraq. Instead of requiring that the plaintiff actually state such a fact, however, the majority has, sub silentio, stated it for him.

That is not, however, all that the majority has stated for the plaintiff. There is nothing in the plaintiff's allegations, even read broadly, to permit the assertion that, even if the Allied planes were going to be taking off from Bahrain to attack Iraq, there was any substantial danger in that area from retaliatory or anticipatory attack, by missile or otherwise, from the forces of Iraq. Indeed, in order to indulge in such speculation, one must specifically assume that Generals Colin Powell and Norman Schwarzkopf, with much of the Middle East at their disposal,[4] were unable to arrange a "staging area" for Allied warplanes that would be safe from such attack. The majority in this case, however, apparently on the basis of its superior military knowledge, must be making such an assertion for the plaintiff because, as far as I can see, that is the only basis for an inference that one's presence in Bahrain in September, 1990, was a place of danger from the forces of Iraq.[5]

---

[4] Arab members of the coalition against Iraq included Bahrain, Egypt, Kuwait, Morocco, Oman, Qatar, Saudi Arabia, Syria and the United Arab Emirates. 15 Encyclopedia Americana (1994) p. 300c.

[5] If that *were* the plaintiff's factual allegation, one would have thought that, after seven revised amended complaints, he would have been able to say so. Indeed, one wonders how the plaintiff would have been able to allege in good faith that, in September, 1990, the Allied forces planned to

The plaintiff's and the majority's reliance upon the State Department travel advisory of August 16, 1990 is equally unpersuasive. I agree with the majority that the advisory in question was a "warning," and that warnings were "the highest level" of travel advisories issued by the State Department at that time. I strongly disagree, however, with the majority's implication that, simply because a "warning" is the highest distinct category of travel advisory, *all* warnings must be read as being sufficient to abrogate the employment-at-will doctrine.

An examination of other warnings in effect in late 1990 reveals that the category of warning was used to cover a broad range of threats to personal safety. For example, a warning concerning Somalia, issued on December 7, 1990, *"urge[d]* private Americans . . . to depart the country as soon as possible" because of "[c]ommunal violence" in Mogadishu, and an increase in violent crime and a state of civil war *contemporaneously occurring within the country*. Likewise, warnings issued regarding the Sudan and Jordan, issued on December 26, 1990, *ordered* the departure of all nonessential personnel and dependents of other government personnel from the affected regions. The Bahrain warning, however, merely *"advise[d]"* Americans to leave the country and *"permitt[ed]"* dependents of United States government officials to do the same, based on the general "continuing unstable conditions in the *region*" following Iraq's invasion of Kuwait. I am therefore not convinced that the Bahrain warning in particular provides sufficient facts to justify circumscribing the employment-at-will doctrine.[6]

---

attack Iraq with airplanes located on Bahrain, and that Iraq intended to and had the capability of retaliating against Bahrain. Certainly the plaintiff was not privy to any such military plans.

[6] I agree with the concurring opinion of Justice Katz that the State Department "warnings are *relevant* when determining whether . . . an employer's dismissal of an employee for refusing to travel to a certain area or country violates public policy." (Emphasis added.) For the reasons discussed in the

Finally, the plaintiff's allegations are insufficient to support his wrongful discharge count because he fails to allege that being sent to Bahrain was not within the normal course of his employment duties. Indeed, because the majority has allowed the count to survive even though the plaintiff's complaint does not make such an allegation, the majority has implicitly placed the burden of proof on this matter on the defendant when it properly belongs on the plaintiff. As the majority recognizes, the public policy at issue gives an employee "a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm *and that are not contemplated within the scope of the employee's duties.*" (Emphasis added.) I would therefore have thought that, in pleading such a cause of action, it would be incumbent on *the employee*, who after all seeks to come within the narrow

text of this opinion, however, I do not agree with the concurring or majority opinion that the specific Bahrain warning in question in this case was sufficient to bring the aforementioned public policy into play.

Moreover, I believe that the concurring opinion's recitation of several travel warnings issued by the State Department in 1996 and 1997, some six and seven years after the travel advisory in question here, is wholly irrelevant. The concurring opinion makes the extraordinary and inaccurate assertion that "the information conveyed [in the 1996 and 1997 warnings] is essentially the same as in the travel advisory at issue in the present case." One only has to compare the language in these current warnings with each other and with the 1990 Bahrain warning; see footnote 3 of the concurring opinion and footnote 6 of the majority opinion; to refute the notion that all of these warnings convey "essentially the same" information. Because all warnings *are* different, it is essential to look at each one to determine whether the particular facts supporting it merit an intrusion into the employer-employee relationship. The fact that certain warnings cited by the concurring opinion, whether recent or contemporaneous with the Bahrain warning, may or may not provide sufficient information to justify abrogation of the employment-at-will doctrine is, therefore, immaterial to the question of whether the Bahrain warning itself provided sufficient justification. Indeed, the plaintiff has never relied, either in any of his seven revised amended complaints, his brief or his oral argument, on any of these subsequent travel warnings.

public policy exception to the employment-at-will doc-trine, at least to allege that the substantial risk of death, disease or serious physical harm that he seeks to avoid was not within his normal duties. I fail to see why it is up to the *employer* to disprove that element of the *plaintiff's* cause of action. Indeed, it would be consis-tent with our jurisprudence to require the plaintiff, who seeks to take advantage of a right based on an exception to the usual common-law rule, expressly to bring him-self within the protection of the claimed public policy. See, e.g., *White* v. *Burns*, 213 Conn. 307, 321, 567 A.2d 1195 (1990).[7]

As a final matter, although I have stated that I agree with the majority's *formulation* of the public policy involved in this termination case, if not the *application* of that policy to these facts, it is necessary for me to articulate what I understand that policy to be, and more important, not to be. The majority uses the word "objec-tively." The majority states that "[t]he only relevant inquiry is whether the employer directed the employee to work in a place or condition that poses *an objectively substantial* risk of death, disease or serious bodily injury to the employee." (Emphasis added.)

If the majority means that the public policy vindicated in such a case is that of the employee's *reasonable belief* regarding the substantial risk of death, disease or serious injury, regardless of whether *in fact* there is such a risk, I disagree with the majority. There is no support for such a policy in any of the sources for the public policy on which the majority draws in this case.

---

[7] Indeed, the majority seems to concede that such an allegation is neces-sary to the plaintiff's cause of action. "[W]e do not [conclude] that the plaintiff has carried his burden of proving . . . that his proposed relocation was not contemplated within the scope of his duties as an employee of the defendant." Given that as part of his burden of *proof*, I fail to see why the failure to *allege* such an important part of the cause of action is not fatal to his complaint.

The employer's obligation, in my view, is to provide what is *in fact* a reasonably safe workplace, irrespective of whether the employee *believes* otherwise, reasonably or unreasonably. To hold otherwise would be to permit an employee's reasonable, albeit *mistaken,* belief that the workplace was unreasonably unsafe, to trump the employer's equally reasonable, and *factually correct,* belief that it *was* reasonably safe.

Thus, I understand the majority to mean that the plaintiff in this case must prove that, in September, 1990, not that he *reasonably believed* that the particular location in Bahrain posed a substantial risk of death, disease or serious physical harm to him, but that *in fact* at that time there *was* such a risk. On that understanding, I agree with the majority. Thus, the plaintiff will have to prove, somehow, that, for example, in September, 1990, the Bahrain location was a credible and realistic target for Saddam Hussein's missiles, and that as a practical matter there was a substantial risk that such missiles would be fired at or around that time. I suspect, therefore, that the extraordinary lengths to which the majority has gone to replead the plaintiff's cause of action will eventually come to naught, because if such proof were even remotely within the plaintiff's contemplation, we would have heard it from him at some point during his seven revised amended complaints, his brief, and his oral argument in this court.[8]

Without belaboring the point any further, in my view it is the absence of any particularized allegations indicating any such substantial risk, *in fact,* to the plaintiff's

[8] In fact, there is no indication in these pleadings, framed years after the events in question, that anyone in Bahrain suffered *any* injury on account of Operation Desert Shield. Of course, the absence of injury does not necessarily mean that there was no substantial *risk* of injury. My point is simply that if the plaintiff *were* able to demonstrate the subsequent fact of injury to someone, such proof would certainly be relevant to the question of risk, and would likely have been pleaded in the plaintiff's complaint or suggested to us as provable under the complaint. Neither the plaintiff nor the majority, however, points to any such fact.

life, health or safety, that is fatal to his claim. I would, therefore, affirm the judgment of the trial court.

BERDON, J., concurring in part and dissenting in part. I agree with Justice Norcott's well reasoned decision that the public policy of this state provides that an employer must provide a reasonably safe workplace for its employees. That public policy is predicated on General Statutes §§ 31-49 and 31-370.[1] Indeed, § 31-49, which provides in relevant part that an employer must provide its employees with "a reasonably safe place in which to work," has its roots in legislation adopted at the turn of this century. See Public Acts 1901, c. 155, § 1 ("[i]t shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work, and fit and competent persons as his colaborers"). Clearly, as Justice Norcott points out, an at-will employee, such as the named plaintiff, Gary F. Parsons (plaintiff), can maintain an action for wrongful discharge resulting from his refusal to subject himself to the danger of an unsafe workplace. I also agree with Justice Norcott that sufficient facts have been alleged in the first count of the plaintiff's complaint to support a cause of action for wrongful discharge.

In my view, sufficient facts were also alleged by the plaintiff in count two to support a cause of action for

[1] Even if we did not have a statute setting forth this public policy, I would still conclude that such a public policy exists. See *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 581, 693 A.2d 293 (1997) (in evaluating claims of wrongful discharge, court may consider "whether [the plaintiff] alleged that his dismissal contravened any judicially conceived notion of public policy"). Furthermore, I point out that, although Justice Borden and Chief Justice Callahan dissent on this issue based upon a claim of insufficient factual allegations, they do not dispute the public policy of the state that an employer must furnish a reasonably safe workplace. Moreover, they do not dispute that an at-will employee who is terminated for refusing to work in such an unreasonably unsafe workplace may maintain an action for wrongful discharge.

intentional infliction of emotional distress and in count three for negligent infliction of emotional distress.[2] It first should be noted that in *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 681–82 & n.4, 513 A.2d 66 (1986), this court held that in a wrongful termination action by an at-will employee based upon a violation of public policy, "[t]here is nothing in that doctrine . . . to preclude an action for . . . infliction of emotional distress based upon unreasonable conduct of the defendant in the termination process."

It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, "all well-pleaded facts and *those facts necessarily implied* from the allegations are taken as admitted." (Emphasis added.) *Amodio* v. *Cunningham*, 182 Conn. 80, 83, 438 A.2d 6 (1980). Indeed, pleadings must be construed "broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Edwards* v. *Tardif*, 240 Conn. 610, 620, 692 A.2d 1266 (1997). The defendant, in order to protect itself from broad based allegations, need only file a request to revise pursuant to § 147 of the rules of practice, in order to compel the plaintiff to amend his pleading for "a more complete or particular statement of the allegations" of the complaint. If the more specific statement had been requested and complied with "the defendants would then have been in a position to move to strike any count of the plaintiff's revised complaint pertaining to [the] respective [liability] for which the plaintiff was unable to allege the necessary prerequisites." *Rowe* v. *Godou*, 209 Conn. 273, 279, 550 A.2d 1073 (1988). The named defendant, United Technologies Corporation, Sikorsky Aircraft Division (defendant), failed to do this in this case.

[2] See the appendix to this concurring and dissenting opinion for the plaintiff's seventh revised amended complaint, the complaint upon which the trial court rendered judgment in favor of the named defendant.

It is well settled that, in order to state a claim of intentional infliction of emotional distress, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986).

The allegations of the second count of the plaintiff's complaint establish a cause of action for intentional infliction of emotional distress. First, the plaintiff alleges that the defendant acted intentionally. Second, the plaintiff alleges that he was discharged because of his refusal to follow the defendant's order to place himself in a situation of extreme danger, which a trier of fact could find constitutes outrageous conduct on the part of the defendant. Finally, the plaintiff sufficiently alleged that the defendant's extreme and outrageous conduct caused him to suffer from severe distress—nervous disorder, sleeplessness and profound episodes of anxiety. Accordingly, this court should reverse the trial court's decision granting the defendant's motion to strike the second count.

The plaintiff pleaded sufficient facts to establish a cause of action for negligent infliction of emotional distress. In order to state a valid claim for negligent infliction of emotional distress, the plaintiff must plead that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978).

Taking as true the facts set forth in count three, it is clear that the plaintiff has sufficiently alleged a valid claim of unintentional infliction of emotional distress. Specifically, on the basis of the plaintiff's pleadings, the defendant should have realized that terminating the plaintiff's employment two hours after he had expressed his desire not to go to Bahrain, and immediately removing the plaintiff from the building under security escort, involved an unreasonable risk of causing emotional distress and that that distress might result in illness or bodily harm. In my view, these allegations are sufficient to survive a motion to strike and, therefore, this court should reverse the trial court's decision granting the defendant's motion to strike the third count.

Accordingly, I concur with respect to part I of Justice Norcott's opinion, but I disagree with respect to parts II and III.

## APPENDIX

"SEVENTH REVISED AMENDED COMPLAINT

"FIRST COUNT

"1. The plaintiff, Gary F. Parsons, was employed as an Instructor of Aircraft Maintenance by the defendant, Sikorsky Aircraft Division, from August 29, 1986, to September 18, 1990.

"2. The defendant, Sikorsky Aircraft Division, United Technologies Corporation (hereinafter 'Sikorsky'), is a Delaware Corporation engaged in the business of manufacturing, distributing and servicing helicopters and other related products.

"3. Robert H. Osborn (hereinafter 'Osborn'), was at all relevant times an employee of Sikorsky and was at all times acting as an agent of Sikorsky.

"4. In September, 1990, Gary F. Parsons, was a member of a Sikorsky project team which had built a nonmilitary helicopter for the Crown Prince of Bahrain.

"5. On September 11, 1990, Osborn assigned Gary F. Parsons to instruct several members of the Bahrain helicopter crew regarding the proper repair and maintenance of the helicopter. Such instruction was to be given in the United States.

"6. The following day, September 12, 1990, Gary F. Parsons was told by Osborn that Mr. Parsons would instead be required to travel to the 'Headquarters, Bahrain Defense Force,' a military installation located near the capital city, and the main staging areas for Allied warplanes on the island of Bahrain, on or about September 20, 1990. Mr. Parsons was to give instruction, sleep and eat all his meals at this one installation in order to implement the repair and maintenance program to the Bahrain crew. He was at all times acting within the scope of his employment, both during his transportation to and from the airbase, and while teaching and residing at the airbase facility.

"7. On or about September 13, 1990, Gary F. Parsons became aware of a warning issued by the United States Department of State, effective on that date and on all relevant dates subsequent thereto, and provided to Mr. Parsons via telephonic message from the Department of State.

"That warning stated:

" 'TRAVEL ADVISORY
United States Department of State
Bureau of Consular Affairs
Washington, D.C. 20520
Persian Gulf—Warning

" 'Persian Gulf (Including Qatar, Bahrain, the United Arab Emirates, and the eastern province of Saudi Arabia)—WARNING.

" 'This replaces the previous advisory, dated August 7, 1990:

" 'Due to the Iraqi military invasion of Kuwait and continuing unstable conditions in the region, the Department of State advises all Americans to defer all non-essential travel to the eastern province of Saudi Arabia, and to Qatar, Bahrain and the United Arab Emirates. The Department is permitting dependents of U.S. government officials to depart the area on a voluntary basis. The Department of State advises other American citizens in the area to consider doing the same. Note that this advisory applies only to the eastern province, not the rest of Saudi Arabia.'

"8. On September 17, 1990, Gary F. Parsons and the defendant Robert H. Osborn met to confirm that the travel warning remained in effect, and to discuss the increased terrorist activities in the proposed area of travel as evidenced by contemporaneous news reports in both the printed and electronic media.

"9. That on September 18, 1990, Gary F. Parsons informed the defendant, via written memo, that due to the threat of imminent danger, and risk to Mr. Parsons' personal safety, health, and welfare as evidenced in part by the travel warning issued by the State Department, and in part by the crisis in the Persian Gulf region which prevailed at the time, Mr. Parsons refused to travel to Bahrain.

"10. The defendant Sikorsky immediately terminated the employment of Gary F. Parsons when he refused to perform a dangerous, possibly fatal, work assignment.

"11. The defendant and Mr. Parsons did not have an employment contract as between them.

"12. The defendant's wrongful termination of Mr. Parsons was demonstrably improper and in violation of the State of Connecticut's public policy requiring an

employer to exercise reasonable care to provide employees with a reasonably safe place to work. This public policy is demonstrated and enumerated by Connecticut General Statutes § 31-370, Duties of employer and employee, which states: '(a) Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees'; and by [General Statutes §] 31-49, Care required of a master for his servant's safety, which states: 'It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work. . . .'

"This policy is further demonstrated and enumerated by: [General Statutes §] 16a-100, Declaration of policy (Atomic Energy); [General Statutes §] 29-307a, Hazardous materials; [General Statutes §] 29-390, Factory fire escapes; [General Statutes §] 29-408, Safety measures to be provided; [General Statutes §] 31-10, Safety inspectors; [General Statutes §] 31-24, Hazardous employment; [General Statutes §] 31-38a, Sanitary, lighting and heating facilities for railroad employees; [General Statutes §] 31-40c, Carcinogens used in workplace; [General Statutes §] 31-40g, Substance hazardous to reproductive systems; [General Statutes §] 31-40j et seq., Toxics in workplace; [General Statutes §] 31-40q, Smoking in workplace; [General Statutes §] 31-40t, Employees right to act in case of hazardous conditions; [General Statutes §] 31-45a, Protection of feet; [General Statutes §] 31-46, Safety regulations for workers in building operations; [General Statutes §] 31-51d, Labor commissioner's powers and duties; [General Statutes §] 31-51x, Drug testing; [General Statutes §] 31-58 (c), 'Fair wage' defined; [General Statutes §] 31-371 (b), Regulations; [General Statutes §] 31-372 (f), Adoption of federal and state standards; [General Statutes §] 31-374 (e), Inspections and investigations; [and General Statutes §] 46a-60 (a)

(20), Hazards to pregnant employees. Mr. Parsons' expressed desire not to enter the Persian Gulf region at that time was an attempt to further that policy.

"13. As a result of the wrongful termination by the defendant, Mr. Parsons was unemployed for a considerable length of time and, as a result, suffered lost wages.

"14. Also as a result of the wrongful termination the plaintiff secured employment at a rate of pay which was substantially less than what he had earned, and would have earned, at Sikorsky. The plaintiff also suffered the loss of all the benefits (medical, pension, etc.), which the plaintiff would have enjoyed absent the defendant's wrongful termination.

"15. As a further result of the defendant's wrongful termination, and in an attempt to mitigate his damages, the plaintiff removed himself and his family from Connecticut, incurring substantial costs and suffering significant financial losses.

"SECOND COUNT

"1–10. Paragraphs 1 through 10 of the FIRST COUNT are hereby incorporated as Paragraphs 1 through 10 of this the SECOND COUNT.

"11. The defendant's termination of the plaintiff was wrongful in that it violated the public policy of the State of Connecticut requiring an employer to exercise reasonable care to provide employees with a reasonably safe place to work.

"12. The immediate termination of Mr. Parsons by the defendant constituted extreme and/or outrageous conduct in that the defendant knew or should have known that said termination was wrongful.

"13. The extreme and/or outrageous conduct of the defendant in wrongfully terminating the plaintiff was

conduct which intentionally or recklessly caused Mr. Parsons severe emotional distress.

"14. As a result of the defendant's wrongful termination of the plaintiff, Mr. Parsons has suffered from nervous disorder, sleeplessness and profound episodes of anxiety.

"THIRD COUNT

"1–10. Paragraphs 1 through 10 of the FIRST COUNT are hereby incorporated as Paragraphs 1 through 10 of this the THIRD COUNT.

"11. The defendant's termination of the plaintiff was wrongful in that it violated the public policy of the State of Connecticut requiring an employer to exercise reasonable care to provide employees with a reasonably safe place to work.

"12. That as a result of the defendant's wrongful termination of the plaintiff, Gary F. Parsons did suffer from the unintentional infliction of emotional distress in that the defendant Sikorsky should have realized that terminating the plaintiff's employment two hours after he expressed his desire not to go to Bahrain, and immediately removing the plaintiff from the building under security escort, involved an unreasonable risk of causing emotional distress and that that distress might result in illness or bodily harm.

"13. As a result of the defendant's conduct surrounding the wrongful termination of the plaintiff, Mr. Parsons has suffered nervous disorder, sleeplessness and profound episodes of anxiety.

"WHEREFORE, the plaintiff claims:

"1. Money damages;

"2. Punitive damages;

"3. Attorney's fees and costs for the bringing of this action; and

"4. All other relief that in equity the court deems proper.

PLAINTIFFS,

GARY F. PARSONS ET AL."

KATZ, J., concurring. I concur with the majority, but write separately in order to highlight what I believe to be a significant factor in the plaintiff's argument that travel to Bahrain posed a danger to his health and welfare. Specifically, I believe that the existence of the travel warning issued by the United States Department of State (State Department); see footnote 6 of the majority opinion; is highly relevant to the plaintiff's argument that his posting to Bahrain violated our stated public policy that an employer must ensure a safe workplace.

At the time of the plaintiff's dismissal, there were three types of State Department travel advisories—warning, caution and notice. These advisories were described in State Department literature as follows: "[1] WARNING—recommends deferral of travel to all or part of a country; [2] CAUTION—advises about unusual security conditions, including the potential for unexpected detention, unstable political conditions or serious health problems (not intended to deter travel to a country); [3] NOTICE—provides information on situations that do not present a broad-scale risk, but which could result in inconvenience or difficulty for traveling Americans." United States Department of State, Bureau of Consular Affairs, "Your Passport To a Safe Trip Abroad," p. 22. The warning upon which the plaintiff relied was, at that time, the most extreme level of travel advisory issued by the State Department and was, indeed, the *only* level of travel advisory aimed at *deterring* travel.

At present, there is only one type of travel advisory used by the State Department. Although it is labeled "Travel Warning," the advisory provides specific cautionary instructions that depend on the hostile climate of the particular country. These cautionary instructions range from reminding tourists to avoid certain areas at night to advising against traveling to a particular country. As of July 15, 1997, there were twenty travel warnings in effect.[1] Two of the current advisories merely caution of danger based on violent crime.[2] The remaining advisories, much like the one at issue in the present case, warn against travel to the posted countries.[3] Although the facts stated may be more compre-

---

[1] Once issued, a travel warning remains in effect until it is either updated or rescinded by the State Department, Bureau of Consular Affairs.

[2] The travel warning regarding Nigeria, issued on November 19, 1996, by the State Department, Bureau of Consular Affairs, provides: "The Department of State warns U.S. citizens of the dangers of travel to Nigeria. Violent crime, practiced by persons in police and military uniforms, as well as by ordinary criminals, is an acute problem. Harassment and shake-downs of foreigners and Nigerians alike by uniformed personnel and others occur frequently throughout the country.

"Nigerian airlines have aging fleets and limited technical capabilities and face serious financial difficulties. The U.S. Embassy is concerned that maintenance and operational procedures for Nigerian airlines may be inadequate to ensure passenger safety.

"Business, charity and other scams target foreigners worldwide and pose dangers of financial loss and physical harm. Persons contemplating business deals are strongly urged to check with the U.S. Department of State or the U.S. Department of Commerce before providing any information, making any financial commitments or traveling to Nigeria. Under no circumstances should American citizens travel to Nigeria without a valid visa. Invitation to enter Nigeria without a visa is normally indicative of illegal activity."

The travel warning regarding Colombia, issued on February 11, 1997, by the State Department, Bureau of Consular Affairs, provides: "The Department of State warns U.S. citizens of the dangers of travel to Colombia. Violence continues to affect all parts of the country. U.S. citizens have been the victims of recent kidnappings, threats, and murders."

[3] The State Department, Bureau of Consular Affairs, also issued the following travel advisories for the listed countries, each labeled as a "Travel Warning," which provided in relevant part:

Afghanistan, issued June 10, 1997: "The Department of State warns all U.S. citizens against travel to Afghanistan. U.S. citizens who choose to

hensive than those in the warning cited by the defendant, these advisories provide interpretive guides

travel to Afghanistan despite this warning should exercise extreme caution, particularly in those areas that have been recently or repeatedly contested or mark the dividing lines between competing armed groups. Intense military activity exists, especially north of Kabul. Westerners remain vulnerable to politically and criminally motivated attacks and violence, including robbery, kidnapping and hostage-taking. Land mines are still prevalent throughout the countryside. Close to 10,000,000 land mines and tons of unexploded ammunition pose a danger to all visitors. Travelers should also be aware that the Islamic Sharia law that is enforced in most of the country prohibits alcohol, video tapes, music, television and social activities between the sexes. All U.S. personnel at the U.S. Embassy in Kabul were evacuated in 1989, and no diplomatic mission represents U.S. interests or provides consular services."

Algeria, issued January 31, 1997: "The United States Department of State warns U.S. citizens to avoid travel to Algeria. The Department recommends that those Americans who choose to be in Algeria despite this warning have substantial armed protection while traveling overland, on their work sites or in their accommodations; other Americans in Algeria should depart. Armed protection is not a guarantee of safety. Continuing attacks against foreigners indicate that the level of risk in Algeria is extremely high. The U.S. Embassy in Algiers also specifically identifies ports and airline terminals as terrorist targets and warns against traveling on regularly scheduled commercial transport. Embassy personnel have suspended their use of regularly scheduled commercial flights. American citizens who remain in Algeria despite this warning are urged to exercise maximum caution and to evaluate regularly their personal security practices."

Angola, issued April 18, 1997: "The Department of State warns U.S. citizens against travel to Angola because of continued unsettled conditions, violent crime and the potential for political-military instability. Travel within Angola remains unsafe due to the presence of bandits, undisciplined police and troops, and unexploded land mines in rural areas. Foreign nationals, especially independent entrepreneurs, are subject to arbitrary detention and/or deportation by immigration and police authorities. Americans planning travel outside Luanda are strongly urged to contact the U.S. Embassy for up-to-date information on security conditions in the provinces they plan to visit. . . ."

Bosnia and Herzegovina, issued June 5, 1996: "The Department of State warns U.S. citizens not to travel to Bosnia and Herzegovina. The war has left landmines and unexploded ordnance throughout the country; roads, airports and railways have been bombed and are not functional. Sniping and carjacking are not uncommon. Law enforcement and civil authority have not been established in many regions. The December 1995 Dayton Peace Accords are being implemented with the NATO-led Implementation

to the concerns of the State Department. Each, like the advisory in the present case, provides the specific reason for the warning. Although the format currently

Force (IFOR) overseeing its military provisions. While progress in establishing a durable peace continues, the situation remains volatile."

Burundi, issued August 23, 1996: "The Department of State again warns U.S. citizens to defer all travel to Burundi and recommends that all U.S. citizens in Burundi leave the country because of the uncertain political and security situation and the suspension of commercial flights. The U.S. Embassy has reduced its staff over the last year and continues to restrict U.S. Government personnel from traveling outside the capital due to the unpredictable incidents of violence throughout Burundi. Furthermore, U.S. Government personnel may travel only to areas in Bujumbura deemed safe by the U.S. Regional Security Officer. Dependents are prohibited from accompanying U.S. Government employees assigned to Burundi."

Cambodia, issued July 9, 1997: "The Department of State warns all American citizens against travel to Cambodia due to political unrest, including fighting in Phnom Penh and reported fighting throughout the country. The curfew in Phnom Penh has been lifted, but the U.S. Embassy there advises American citizens in Cambodia to remain at home at night and exercise extreme caution until the situation stabilizes. The Department of State has ordered the departure of dependents of American Embassy employees and non-emergency U.S. Embassy employees. American citizens currently in Cambodia should depart the country as soon as possible. . . . "

Central African Republic, issued March 28, 1997: "The U.S. Department of State warns U.S. citizens to defer all travel to the Central African Republic due to continued armed conflict within the country. The deteriorating security and political situation has led the Department to order the departure of all official Americans and dependents and to suspend its diplomatic presence in the Central African Republic. The U.S. Government's ability to provide emergency consular services will be severely limited, and Americans currently in the Central African Republic are strongly urged to depart at this time."

Congo (Brazzaville), issued June 17, 1997: "The Department of State warns U.S. citizens to cancel travel to the Congo-Brazzaville due to the deteriorated security situation and the suspension of operations of the U.S. Embassy in Brazzaville. Shooting and other acts of violence have occurred between elements of the Congolese military and paramilitary groups. Combatants have set up roadblocks in various parts of the city and movement within the city is dangerous. A dusk-to-dawn curfew is in place. Ferry service to Kinshasa is inoperable at present. The airport in Brazzaville is closed to commercial traffic at this time. On June 17, the Department ordered the closure of the U.S. Embassy in Brazzaville as of June 18, 1997 and the departure of all official personnel. The government of France is assisting its nationals who wish to leave and reducing its military force in the Congo.

used may be slightly more comprehensive, the information conveyed is essentially the same as in the travel advisory at issue in the present case. The current warnings are relevant to demonstrate that, although there may be "ambient dangers" in many parts of the world

Again the Department of State strongly urges U.S. citizens in the Congo to depart the country."

Democratic Republic of Congo (formerly Zaire), issued June 4, 1997: "The Department of State warns U.S. citizens to defer all non-essential travel to the Democratic Republic of Congo (formerly Zaire) due to the uncertain political and security situation in parts of the country. The new government forces are still in a formative state and have not yet taken full control of the country. There are continued reports of pillaging, vehicle thefts, carjackings and extrajudicial violent settlements of accounts in some parts of Kinshasa, as well as ethnic tensions and continued military operations elsewhere in the country. As of early June 1997, customs and immigration services have not been fully re-established in Kinshasa. The ferry service to Brazzaville is currently inoperative, though many airport services are now operating."

Iran, issued July 8, 1997: "The Department of State warns all U.S. citizens against travel to Iran, which remains dangerous because of the generally anti-American atmosphere and Iranian government hostility to the U.S. government. U.S. citizens traveling to Iran have been detained without charge, arrested, and harassed by Iranian authorities. Former Muslims who have converted to other religions, as well as persons who encourage Muslims to convert, are subject to arrest and possible execution. In addition, the Iranian government reportedly has the names of all individuals who filed claims against Iran at the Iran-U.S. Claims Tribunal at the Hague pursuant to the 1981 Algiers Accords. There are restrictions on both import and export of goods between Iran and the United States. The U.S. government does not currently have diplomatic or consular relations with the Islamic Republic of Iran. The Swiss government, acting through its embassy in Tehran, serves as the protecting power for U.S. interests in Iran, but the Iranian government generally does not permit the Swiss to provide protective services for American citizens whom they consider to be Iranian national by birth or naturalization. Neither U.S. passports nor visas to the U.S. are issued in Tehran."

Iraq, issued June 25, 1997: "The Department of State warns all U.S. citizens against travel to Iraq. Conditions throughout the country remain unsettled and dangerous, and U.S. passports are not valid for travel to, in or through Iraq, unless they are validated by the Department of State. The United States does not have diplomatic relations with Iraq. There is no U.S. Embassy in Iraq, and the United States government cannot provide normal consular protective services there to U.S. citizens. U.S. government interests in Iraq are represented by the government of Poland, which, as a protecting power, can provide only limited emergency services to U.S. citizens. In addition,

warranting an advisory to travelers, only certain circumstances are so extreme as to warrant a governmental advisory aimed at *deterring* travel. Specifically, when a country is in the middle of a war, whether international or civil, and particularly when the United States is involved, any reasonably prudent United States citizen,

there is a U.S. trade embargo which severely restricts financial and economic activities with Iraq, including travel-related transactions."

Lebanon, issued July 15, 1996: "The United States Department of State warns all U.S. citizens against travel to Lebanon. The situation in Lebanon is so dangerous that no U.S. citizen can be considered safe from terrorist acts. While all of the known American hostages have been released, the organizations which abducted them continue to operate within the country. U.S. passports are not valid for travel to, in or through Lebanon unless special validation has been obtained. Due to an extremely limited staff and heightened security, the U.S. Embassy in Beirut cannot perform normal consular functions. In addition, local telephone service is unreliable and it is difficult to contact the U.S. Embassy by phone or to place a local call from most of the country. . . ."

Liberia, issued September 13, 1996: "The Department of State warns U.S. citizens against travel to Liberia. Although West African peacekeepers (ECOMOG) have redeployed throughout Monrovia and reestablished the city as a safehaven, there are frequent reports of armed robberies and other crimes throughout the city. Sporadic fighting continues outside of Monrovia with travelers encountering harassment and physical violence by armed combatants manning roadblocks. . . ."

Libya, issued June 3, 1997: "The United States Department of State warns all U.S. citizens to avoid travel to Libya and to depart the country immediately if residing or visiting there. The U.S. government has determined that due to Libya's long history of flouting international law and directing terrorist attacks against U.S. citizens, it is unsafe for Americans to travel there. U.S. passports are not valid for travel to, in or through Libya unless a special validation is obtained from the Department of State. In addition, all financial and commercial transactions with Libya are prohibited, with very limited exceptions, unless licensed by the U.S. Treasury Department. . . ."

Rwanda, issued February 14, 1997: "The Department of State warns U.S. citizens to defer travel to Rwanda. Violent attacks and terrorist threats against foreign aid workers have increased since mid-January 1997 and the country suffers from low intensity insurgent attacks in all areas. Poor communication, transportation, and health services also continue to make travel in Rwanda difficult and potentially hazardous. . . ."

Sierra Leone, issued February 1, 1995: "The Department of State warns U.S. citizens to defer travel to Sierra Leone. Travel within Sierra Leone should be considered extremely hazardous due to random and sporadic attacks by insurgents. . . ."

whose presence is not essential to the national interest of the United States, should not travel to that country, because to do so would risk his or her personal safety. By citing to these advisories I do not intend to hold that an employee may, based solely on the strength of such an advisory, refuse to travel to one of these countries without fear of losing his or her job; I merely state that such warnings are relevant when determining whether, in a case such as the present case, an employer's dismissal of an employee for refusing to travel to a certain area or country violates public policy.[4]

Moreover, I take issue with the assertion in Justice Borden's concurring and dissenting opinion that this court is ill-equipped to determine whether the country of Bahrain was threatened by the military buildup evidenced in the newspaper accounts referred to in general by the plaintiff in his pleadings and in specific by the majority in its opinion. One need only look to those articles cited by the majority regarding the deployment of troops to the region and to the attached map from

Somalia, issued June 28, 1996: "The Department of State warns U.S. citizens against all travel to Somalia. Sporadic fighting among local militias continues in parts of the country. Kidnappings and other threats to foreigners occur unpredictably in virtually all regions. There is no national government in Somalia to offer security or police protection for travelers. There is no U.S. diplomatic presence in Somalia to provide consular assistance to U.S. citizens. United Nations peacekeeping forces were withdrawn from Somalia in March 1995 and all U.S. citizens were advised to depart the country."

Sudan, issued January 31, 1996: "U.S. citizens are warned against all travel to Sudan because of violence within the country. Due to concerns regarding the Sudanese government's ability to adequately ensure the safety of American officials, the United States has suspended its diplomatic presence in Sudan. The U.S. government's ability to provide emergency consular services will be severely limited and Americans currently resident in Sudan may wish to consider departing at this time."

[4] We take judicial notice of these advisories, and of the occurrences in the Persian Gulf, not to supplement the plaintiff's original pleadings but to aid this court in interpreting those pleadings, in the furtherance of our policy that pleadings are to be construed "broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 588, 542 A.2d 1124 (1988).

the New York Times, August 9, 1990, p. A1, to recognize Bahrain's central position in the theater of military buildup and operations.

Accordingly, I concur.

The New York Times

The disposition of United States forces on and around the Arabian Peninsula, as detailed by Gen Colin L Powell, the chairman of the Joint Chiefs of Staff, in a briefing yesterday at the Pentagon.