[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant case is an employment matter wherein the plaintiff asserts that he was wrongfully discharged. The defendants are the former employer and its president.
A six-count complaint alleges the following causes of action: first count, wrongful termination of employment principally for the reason that the plaintiff expressed concerns about violations of security matters by his former employer; second count, wrongful termination of employment caused principally by the plaintiff's complaints about misrepresentations that were made to a customer by his former employer; third count, breach of the plaintiff's employment contract in retaliation for the CT Page 10447 plaintiff's insistence that a customer of his former employer should be made aware of unfavorable test results and not be misled by false reports and his insistence on quality products; fourth count, breach of the implied covenant of good faith implicit in his contract of employment in that his former employer sought to involve the plaintiff in acts and misrepresentations that were contrary to the public policy of the United States as expressed in a security manual and contrary to the public policy of the State of Connecticut concerning fraudulent and deceptive acts in trade or commerce; fifth count, negligent infliction of emotional distress caused by conduct of the defendants at or about the time of his termination; sixth count, interference by the defendant Springer with the plaintiff's employment agreement because of the reasons summarized above. The defendants have denied the gravamen of each of the counts.
 I
From the evidence produced at the trial, the court finds that the facts set forth below were established.
The defendant Andersen Laboratories, Inc. (hereinafter Andersen) is engaged in the manufacture and sale of microelectric devices used by other manufacturers for telecommunications and related applications. Its plant is located in Bloomfield, Connecticut. Among Andersen's important customers are Northern Telecom and Whittaker Electronic Services. Some of Andersen's work is classified, and in this category Andersen deals with Defense Investigative Services (hereinafter D.I.S.) a branch of the Department of Defense.
The plaintiff went to work for Andersen in August 1981. Previously he had been employed at Norden Systems as a test equipment engineer. He was hired at Andersen after being interviewed by Ernest Hodur, who was then the president. The plaintiff related his conversation with Hodur as follows: Hodur described the position of Quality Control Manager as a new one for Andersen Laboratories. What he wanted was a professional to come into the organization, and he was going to back quality; he wanted it to work. He said to me that Tom, as long as you do a quality job for me, I will never terminate your position. If you reject [a] product, you are doing your job; you don't have to worry about that. Hodur then said that Andersen had a history of recognizing long-term employees and that if there were a problem, CT Page 10448 they usually tried to work it out by speaking to the employee or by reassigning the employee to a lower position. On cross-examination, however, the plaintiff testified that Hodur never indicated that he would never be laid off and Hodur never indicated that there would be no reorganizations affecting him or his job.
In 1982, the plaintiff's title was upgraded to Director of Quality Assurance. Later he was appointed Facilities Security Officer and in 1984-85 he served as temporary head of the Computer Services Department. The plaintiff held the positions of Director of Quality Assurance and Facilities Security Officer until June 24, 1994. As Director of Quality Assurance, the plaintiff was in charge of inspection of company products and metrology. In his capacity of Facilities Security officer, the plaintiff was in charge of security on projects in which the government through the Department of Defense had an interest. When the plaintiff was hired, his yearly salary was $32,000.00. When he was fired, his yearly salary had increased to $64,000.00 plus a company car that was valued at $11,000 per year. In addition to direct salary payments, Andersen had a pension plan and a 401k program. The plaintiff contributed 13% of his salary to the 401k. He did not know whether Andersen supplied matching contributions but recalled that up to 10% of his salary was supposed to be deposited by the corporation in profitable years. Andersen contributed an amount equal to 3% of the plaintiff's salary to the pension fund.
The plaintiff represented Andersen on two industry related committees, Jedec and the Ozone Depleting Substance Committee. Jedec, the acronym for Joint Electronic Device Engineering Council, was part of the Electronics Industry Association. The Ozone Depleting Committee was concerned with the reliability of products as affected by new environmental laws. It was chaired by Northern Telecom.
Nine employees reported to the plaintiff as Director of Quality Assurance. He, in turn, reported to his supervisor who initially was Ernest Hodur, but in 1992 or 1993, Hodur was succeeded by the defendant Springer. Annual performance reviews were conducted by the plaintiff for the employees who reported to him. Hodur and then Springer prepared a yearly evaluation for the plaintiff. The plaintiff received favorable reviews. The last one submitted at the trial was by Springer and dated August 2, 1993. Among other things, the plaintiff received a 5% increase in CT Page 10449 salary retroactive to June 7, 1993.
In 1989, Andersen was sold by its parent Andersen Group to Alico, a Connecticut corporation, which had been formed by Ernest Hodur and Creative Electric, a New York corporation controlled by Springer. Alico then changed its name to Andersen Laboratories, Inc. Hodur became president of Andersen, and Springer became executive vice-president. Later, Springer succeeded Hodur as president.
During Ernest Hodur's term as president, he replaced Andersen's general manager with a new person from a company known as Microtime. The new general manager had a reputation of being tough and of not being concerned with quality. He emphasized manufacturing and shipping as quickly as possible. If quality control held things up, the new general manager complained to the president. The plaintiff believed that from the advent of the new general manager, concern for quality at Andersen declined.
The plaintiff had several disagreements with Singer about the quality of products. In December, 1993, the plaintiff was invited to the Creative Electric Plant in Auburn, New York, where Springer showed him a new process for making substrates[1] that would be used in products made for Northern Telecom. The process involved using a water soluble flux. The plaintiff told Springer that his product was okay but not acceptable to the electronics industry because the water soluble flux was highly corrosive. Subsequently, Creative Electric sent 600 substrates to Andersen. Some were tested by the plaintiff and failed and some were sent to Northern Telecom where they failed the test performed upon them. The plaintiff reported the results of his test at a meeting of the Ozone Depletion Committee in Ottawa, Canada, on May 5 and 6, 1994. Internal memoranda summarizing each test were circulated among the managerial staff including Springer. According to the plaintiff, the purpose of the memoranda was "to notify all the people associated with the process, including Mr. Springer, that the use of water soluble flux would have a detrimental effect on the reliability of products."
Later, after Lewis Springer became president, the plaintiff informed him that Ernest Hodur had given false information to Northern Telecom as to results of a test known as ball and shear performed on oscillators[2] being prepared by Andersen. Springer ordered the plaintiff to prepare a report, but other personnel contradicted the plaintiff's interpretation of what CT Page 10450 Hodur had said, and the issue was never settled.
In April, 1994, a specialist from Martin-Marietta conducted a detailed quality survey of Andersen, the unfavorable results of which placed Andersen on Martin-Marietta's disapproved supplier list. One of the major deficiencies noted by the inspector was the presence of different revisions of drawings in the production area. Springer's memorandum to the plaintiff and John Kissel, the production manager, included the following sentences: "Production should not have out of date prints on the floor without proper reason and notice. Quality Assurance should audit the drawings in use and should notify production management whenever there is a discrepancy. In particular since both production and QA were aware that a survey was about to be performed, they each should have done their own walk through on the day before."
Disagreements between the plaintiff and Lewis Springer also existed with respect to the plaintiff's position as Facilities Security Officer. In this position the plaintiff was in charge of all classified information. D.I.S. had a manual that contractors and subcontractors, such as Andersen, were required to follow. Section 5-704 of the manual provides that "In all instances where specific instructions have been issued by a user agency[3] for the disposition or destruction of its classified material, such instructions shall be honored by the contractor. Section 5-705 provides in part that "Contractors shall destroy classified material in their possession as soon as possible after it has served the purpose for which it was, (i) released by the government, (ii) developed or prepared by the contractor and (iii) retained after completion or termination of the contract." Methods of destruction are set forth in § 5-706. Destruction of classified material must be beyond recognition in order to preclude reconstruction of the classified information. Paper-based products can be destroyed by various methods of which two are burning or shredding. Materials in microform, that is, microfilm, microfiche or similar high data density material may be destroyed by burning or chemical decomposition or other methods approved by the CSO[4].
In July, 1993, as a result of a contract with Whittaker Electronic Systems, Andersen had developed classified information of two types: portions of paper and microform tape. Lewis Springer wanted to retain the nonclassified portions for warranty of product purposes, but Whittaker insisted on total destruction. Springer then decided that an acceptable plan would be to separate the classified from the unclassified material. For the CT Page 10451 classified information that was on paper, Springer proposed placing an opaque material over it, photocopying the unclassified part and then destroying the original document leaving a copy containing only unclassified information. For the tapes, Springer's suggestion was to read the unclassified material onto a new tape and then destroy the original. Springer's plan generated several items of correspondence between himself and the plaintiff who felt that the plan contravened provisions in the D.I.S. manual and putting it into operation without prior approval from D.I.S. could expose him to a federal prosecution.
Before the Whittaker problem arose, the plaintiff had submitted questions dealing with plans for destruction and interpretations of the D.I.S. manual to John Oliver, the D.I.S. representative in Hartford. He testified that when Springer changed his mind so that he could seek D.I.S. approval for Springer's proposals, the memo dated June 14, 1994, arrived too late to prevent the destruction of the material. Springer's testimony was that he told the plaintiff not to contact D.I.S. until Andersen had developed a definitive proposal and that his countermanding memo sent by fax on June 14, 1994, was in confirmation of his oral instructions to the plaintiff, which, if heeded, would have prevented the destruction of at least the documentary material. John Oliver was called as a witness and in response to a question from the court, testified that if the classified information were sufficiently blacked out, he "guessed" that a new unclassified document could be obtained by photocopying and then destroying the original without prior D.I.S. approval.
In the new company that was founded to purchase Andersen Laboratories, Ernest Hodur owned 15% of the stock and Creative Electric owned 85%. A few years after the takeover, Lewis Springer hired two consultants to evaluate Andersen. John Barwinczok of J.B. Quality Consulting, Inc. was engaged to look solely at quality control. The second consultant, Business Resource Networks, was to look at the entire operation. That firm hired Michael Busse to do the job. Later, Springer, himself, prepared a written assessment, dated January 12, 1993, of Andersen's problems, which was distributed to various department heads including the plaintiff and to Michael Busse. With reference to quality control, Springer wrote "Company cannot consistently produce quality products" and "Quality-Production interface hostile; neither plays their required role." About four months earlier, Springer changed the chain of command at Andersen CT Page 10452 so that effective September 28, 1992, the plaintiff in his function as "Director of Quality" reported directly to Springer as Chief Executive Officer. The reason given was that "we are not making progress rapidly enough on our quality problems."
In performing his evaluation of Andersen, Michael Busse evaluated each department and personnel in each department. He checked the standard operating procedure of the various departments and compared them to known good business practices. He interviewed employees, vendors and competitors. In the course of the evaluation, he produced several written reports. Michael Busse's inspection took about one year. His consultancy lasted even longer. From his interviews, visits and evaluations, Michael Busse opined that the cost of quality control was too high; that in some areas there was too much inspection and in others not enough; that the same standards were used for military and civilian production; that the Quality Control and Manufacturing Departments were not working together; that workmanship standards for Quality Control personnel were not sufficiently established and that the manuals they used were outdated. Busse discussed these points with the plaintiff, but in his report dated March 22, 1993, he wrote, "It doesn't appear as though Tom or any QC people have attempted to utilize any of my suggestions or thought processes." Michael Busse contemplated a quality control system where inspections could be done on the floor during the making of a product rather than the "gatekeeper" system of inspection after products had been completed that he found existed at Andersen. Under his proposal, the manager of quality control would be at a lower level than the plaintiff who, he stated, would not fit in.
Busse, who had been a facilities security officer for many years, advised the plaintiff to take Springer's plan for declassifying the Whittaker documents and tapes seriously and to get opinions from people other than individuals at D.I.S. According to Busse, D.I.S. would disapprove of almost any plan unless before submission, it was well-defined, fully understood and ready to be implemented. On September 6, 1994, Busse was made general manager of Andersen. Later he became vice-president and chief operating officer to whom the sales, manufacturing and quality departments reported.
As a result of Michael Busse's reports and Springer's own assessments, considerable changes were made in Andersen's managerial structure and line operation. The position of Director of Engineering was eliminated in January, 1991. The chairman CT Page 10453 (Springer) assumed a more direct role in the company as of February 1992. The President (Ernest Hodur) was demoted to vice-president, and the chairman (Springer) became president in May, 1993. The positions of Director of Quality Assurance (plaintiff) and Quality Engineer were eliminated in June, 1994. The former Quality Engineer, who had been the plaintiff's assistant, was hired for the newly created post of Quality Systems Manager in July, 1994, at a salary of $44,000.00 whereas the plaintiff's salary had been $64,000.00, plus automobile. Also, in July, 1994, the plaintiffs' assistant in facility security was upgraded to Field Security Officer. The position of Director of Operations (John Kissel) was eliminated in September, 1994. By June of 1997, the positions of Director of Sales and General Manager were eliminated. A new position of Technical Officer was created and is filled by Springer. Michael Busse was upgraded to vice-president. In sum, the managerial staff has been halved and twenty lower-level employees have been laid off.
The letter of termination that Springer handed the plaintiff on June 24, 1994, stated that the position of Director of Quality Assurance was being eliminated and that the plaintiff would be laid off as of September 15, 1994. In the meantime, the plaintiff could continue to use the company car and he would work on the special projects outlined in an attachment to the letter. Basically, the special projects were to inform Springer of the plaintiff's activities as Andersen's representative on industry-wide committees. Although not mentioned in the letter, the plaintiff's security clearance was cancelled as no longer necessary.
A written announcement that the plaintiff would be leaving was circulated at Andersen on June 27, 1994. When the appointment of the new Quality Systems Manager was announced one month later, the announcement included the following statements of company policy. "It is our intention that the company shall move away from the concept of a quality control group that acts as a gatekeeper. We shall be moving towards a Total Quality Management philosophy in which everyone will be responsible for quality with the Quality Department being tasked to monitor results and provide feedback. This does not represent a softening of the company's posture on quality. It does represent the company's commitment to make everyone responsible for quality." (emphasis in original).
Apparently, the announcement of the impending departure of CT Page 10454 the plaintiff was interpreted erroneously as eliminating deductions against his salary for 401k contributions and medical and dental insurance. At the plaintiff's request, the payroll situation was corrected retroactively on August 11, 1994.
The plaintiff was out of work until September 16, 1996, when he was hired by Amphenol at a yearly salary of $54,000.00. In efforts to find a job, he sent out about 200 resumes and letters. In the interim period, the plaintiff received $17,810.00 in unemployment compensation and $4,374.00 for a temporary teaching job. For damages, the plaintiff claims total lost wages, after deducting the unemployment and teaching compensation of $140,326.76, if increases of 5% per year are to be considered or $133,918.20 without such increases. Also, he claims $147,207.60, determined by multiplying the difference between his salary at Andersen and his salary at Amphenol by 6, the number of years until his retirement if he had remained at Andersen.
From March through June of 1994, the plaintiff was totally pre-occupied with his work situation particularly his fears that he was being asked to contravene the D.I.S. regulations. After he was discharged, he consulted a physician about his blood pressure. As time went by, the plaintiff became increasingly distraught as he saw a reversal of roles between himself and his wife who is a full-time adjudication specialist with the State Labor Department.
The plaintiff ascribed his termination to retaliation for opposing Springer on security matters and to Springer's dislike of the amount of control that Quality Assurance had He characterized the reorganization of the managerial staff at Andersen as a facade. The defendants, of course, view the plaintiff as an at will employee who could leave or be terminated at any time. The defendants also claim that the reorganization was genuine, based upon consultants' advice and in-house assessments.
 II
First among the issues to be determined is the status of the plaintiff when he was employed by Andersen. Was he an employee at will or did his employment have more definitive provisions and guaranties? Generally an employment contract of indefinite duration is one terminable at the will of either party for good cause, for no cause or even for a cause that is morally wrong. CT Page 10455Magnan v. Anaconda Industries, 193 Conn. 558, 563 (1984). To establish otherwise, the plaintiff had the burden to prove that the conditions of his employment were such that he could not be terminated unless for good cause or without a prescribed procedure. Coelho v. Posi-Seal International, Inc.,208 Conn. 106, 112 (1988).
In this case, as in Coelho, supra, 208 Conn. 109, the evidence as to terms under which the plaintiff was hired are from his own testimony concerning statements made by Ernest Hodur during the pre-employment interview. These statements are included in the court's findings of fact, but some of them bear repeating here because the factual circumstances of the plaintiff's relationship with Andersen must be viewed in the context of the rules governing unilateral contracts. Torosyan v.Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 13
(1995). On direct examination, the plaintiff did testify that Hodur said to him, "Tom, as long as you do a quality job for me, I will never terminate your position." On cross examination, however, the plaintiff testified that at the pre-employment interview, and subsequently, Hodur never indicated that the plaintiff would never be laid off nor did Hodur ever indicate that there would be no reorganizations affecting the plaintiff or his job. In the court's opinion, the situation at hand is markedly different from those portrayed in Coelho v. Posi-SealInternational, Inc., supra, 208 Conn. 109-111 and Torosyan v.Boehriger Ingelheim Pharmaceuticals, Inc., supra, 234 Conn. 7-9. Moreover, with respect to Hodur's statement as reported by the plaintiff on his direct examination, a proper question is whether employer or employee, would be the monitor of the plaintiff's job performance. The plaintiff has failed to prove that Hodur's statements promised anything more than employment of indefinite duration. Consequently, the court's conclusion is that the plaintiff was an employee at will.
In Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471
(1980), the Supreme Court aligned Connecticut with numerous other jurisdictions that permit an employee at will to sue for wrongful discharge where the claim is that the discharge violates public policy although the concept of public policy has never been precisely defined, Sheets, supra, 179 Conn. 478. Sheets and subsequent decisions, however, all refer to discharges in situations where the reason for the discharge involved impropriety derived from some important violation of public policy contained in an explicit statute or constitutional CT Page 10456 provision or a judicially crafted notion of public policy. e.g.,Antinerella v. Rioux, 229 Conn. 479, 492 (1994); Carbone v.Atlantic Richfield Company, 204 Conn. 460, 470 (1987); Morris v.Hartford Courant Company, 200 Conn. 676, 680 (1986).
Later decisions established that the public policy involved could be federal as well as state, Faulkner v. UnitedTechnologies Corporation, 240 Conn. 576, 585-86 (1997) and that a public policy expressed in a state statute could be contravened outside the boundaries of the state. Parsons v. UnitedTechnologies Corporation, 243 Conn. 66, 81 (1997). In terms of scope, however, the decisions describe the public policy exception to the employment at-will rule as a narrow one designed to balance the competing interests of employers and at-will employees. Id., 243 Conn. 79; Morris v. Hartford Courant Company,supra, 200 Conn. 679. The employer must be allowed to decide about personnel without fear of incurring civil liability. On the other hand, the employee must be protected against action by his employer where that action contravenes public policy. Antinerellav. Rioux, supra, 229 Conn. 492.
Faulkner v. United Technologies Corporation, supra,240 Conn. 587 cites with approval several cases from other jurisdictions holding the public policy exception applicable for situations where employees were discharged for reporting violations of federal regulations or for refusing to violate federal regulations. The court concludes that the D.I.S. manual is federal regulatory matter. But the plaintiff did not prove his claim that Singer's proposed schemes of masking the classified portions of the Whittaker documents, photocopying the unclassified portions and destroying the originals violated the manual's provisions or made him a candidate for prosecution. Granted, as the Supreme Court has said, "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." Sheets v. Teddy's FrostedFoods, Inc., supra, 179 Conn. 480. On this point, however, the testimony of John Oliver, although somewhat equivocal, was adverse to the plaintiff.
The other disputes or disagreements that occurred between the plaintiff and Springer such as the controversy as to whether Hodur lied about test results to Northern Telecom or the disagreement concerning the water soluble flux method used to produce substrates at Creative Electric are simply not within the public policy exception to the employment at will rule. One CT Page 10457 function of the exception is "to draw the line between claims that genuinely involve the mandates of public policy and are actionable and ordinary disputes between employee and employer that are not." Sheets v. Teddy's Frosted Food, Inc., supra,179 Conn. 477. Battista v. United Illuminating Company,10 Conn. App. 486, 497 (1987).
 III
The plaintiff suggests that the implied covenant of good faith and fair dealing, theoretically a part of every contract, provides an alternative reason for recovery. In the same section of his brief, however, he seems to appreciate that in an employment situation, decisions such as Carbone v. AtlanticRichfield Company, supra, 204 Conn. 470-71 limit his suggestion's viability. The precise language from Carbone is "Thus, absent a showing that the discharge involves an impropriety which contravenes some important public policy, an employee may not challenge a dismissal based upon an implied covenant of good faith and fair dealing. 204 Conn. 470-471. Since the court has concluded that the plaintiff did not prove his violation of public policy claim, the covenant of good faith and fair dealing is not pertinent. Unless there is a public policy violation, there is no breach of the implied covenant of good faith and fair dealing. Doherty v. Sullivan, 29 Conn. App. 736, 743 (1992).
Some further explanation should be made as to why in an employment at will situation, the public policy violation and the covenant of good faith and fair dealing are so intertwined. In every employment situation, there has to be some type of agreement. Otherwise the employee would not be working. Torosyanv. Boehringer Ingelheim Pharmaceuticals, Inc., supra,234 Conn. 13. But where the employment is terminable at will, a party cannot ordinarily be deemed to be lacking in good faith when the right to leave or the right to terminate is exercised. Magnan v.Anaconda Industries, Inc., supra, 193 Conn. 572. When based on a public policy violation, however, the right to terminate is not being exercised in good faith and for that reason, among others, the employee's termination is unenforceable. see Mangan, supra.
 IV
Unlike the covenant of good faith and fair dealing, the plaintiff's claim that the defendants negligently caused him emotional distress does stand on an independent ground. A lack of CT Page 10458 proof of a violation of public policy in an employment at will termination does not preclude an action for unintentional infliction of emotional distress based on the unreasonable conduct of an employer in the termination process. Morris v.Hartford Courant Company, supra, 200 Conn. 681-82. The tort of unintentional infliction of emotional distress was established in Connecticut by Montinieri v. Southern New England TelephoneCompany, 175 Conn. 337 (1978). The tort does not require proof of either ensuing physical injury or a risk of harm from physical impact. Id., 175 Conn. 345. But the plaintiff must plead and prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Parsons v. United Technologies Corporation, supra,243 Conn. 88 quoting Montinieri v. Southern New England TelephoneCompany, supra, 175 Conn. 345.
In Parsons v. United Technologies, supra, 243 Conn. 89, the Supreme Court noted that "very few courts have addressed the requirements of a claim for negligent infliction of emotional distress within the context of an employment relationship much less in the context of the termination of such a relationship." The court, however, ruled that the actions taken by employer, in that case, to terminate the employment were not so unreasonable that they support an action for negligent infliction of emotional distress. The language in Parsons is analogous to this case. An essential element of the tort is conduct that is extreme and outrageous. Rudziewicz v. The Stanley Works, No. 92-0505387-S,1997 Ct. Sup. 971 (Jud. Dist. of Hartford-New Britain at Hartford 1997); Chieffalo v. Norden Systems, Inc., No. 92-0127694S,1996 Ct. Sup. 5316-00 (Jud. Dist. of Stamford/Norwalk at Stamford 1996). Neither before, during or after the termination procedure could Springer's conduct be so characterized.
 V
The court agrees with the plaintiff's statement that Connecticut recognizes the tort interference with an employment agreement. Herman v. Endress, 187 Conn. 374 (1982). It is one of the many varieties of the tort of interference with a business relationship. see Blake v. Levy, 191 Conn. 257, 260 (1983). The essential elements of this tort are (1) a business relationship between the plaintiff and another party, (2) the defendant's intentionally interfering with it while knowing of the relationship; and (3) as a result of the interference, the CT Page 10459 plaintiff suffered an actual loss. DiNapoli v. Cooke,43 Conn. App. 419, 426 (1996).
To claim, however, that Springer, the president of Andersen, committed the tort of interference with a business relationship because he terminated one of Andersen's employees is specious reasoning. Not every act of interference is tortious. The test is whether the actor's conduct is "improper." Blake v. Levy, supra,191 Conn. 261 n. 2 citing 4 Restatement (Second), Torts c. 37, introductory note and §§ 766A, 766B (1979). There was no evidence showing that Springer was not acting for Andersen in the termination of the plaintiff. And absent a violation of public policy, it is not "improper" for a corporation's president to discharge one of the corporation's at will employees.
 VI
Whether the reorganization at Andersen was a pretext for getting rid of the plaintiff or a legitimate reduction in personnel presents a question of fact. Coelho v. Posi-SealInternational, Inc., supra, 208 Conn. 106. In light of the consultants' reports, Springer's assessments and the number of people whose jobs were eliminated, this issue is resolved in the defendants' favor.
 VII
Judgment is rendered for the defendants.
Barnett, J.