Wayne DUPEE, Plaintiff,

v.

KLAFF's, INC., Defendant.

No. 3:05cv344 (JBA).

United States District Court,
D. Connecticut.

Nov. 8, 2006.

See, also, 462 F.Supp.2d 244.

Jeffrey S. Bagnell, Horner & Bagnell, Darien, CT, for Plaintiff.

Amy L. Van Dyke, Jeffrey A. Dempsey, Updike, Kelly & Spellacy, P.C., Hartford, CT, Christopher L. Brigham, Updike, Kelly & Spellacy, P.C., New Haven, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 28] AND PLAINTIFF'S MOTION TO STRIKE [DOC. # 38]

ARTERTON, District Judge.

Plaintiff Wayne Dupee commenced this action against his former employer, Klaff's, Inc. ("Klaff's") seeking redress for alleged retaliatory discharge in violation of Conn. Gen.Stat. § 31–290a (Count 1), alleged violation of the Federal Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count 2), alleged violation of the Connecticut Family and Medical Leave Act, Conn. Gen.Stat. § 31–55pp *et seq.* (Count 3), alleged failure to compensate plaintiff for time lost due to a workers compensation claim in violation of Conn.

Gen.Stat. § 31–312 (Count 5), and alleged negligent infliction of emotional distress (Count 6), all arising out of his treatment and eventual termination from his position as a security officer at Klaff's. *See* Am. Compl. [Doc. # 32]. Plaintiff's Connecticut Family and Medical Leave Act claim (Count 3) was dismissed on consent based on failure to exhaust administrative remedies. *See* Order [Doc. # 20]. Additionally, in his opposition memorandum, plaintiff consents to dismissal of Count 5. *See* Pl. Opp. [Doc. # 35] at 26.[1]

Defendant now moves for summary judgment [Doc. # 28] on all remaining claims. As to Count 1, defendant argues that plaintiff cannot prove that he was terminated for filing a workers' compensation claim and, even if he could establish a *prima facie* case of retaliation, Klaff's has presented a legitimate business reason for its termination of plaintiff. Defendant contends it is entitled to summary judgment on Count 2 because it did not interfere with plaintiff's rights under the FMLA. As to Count 6, defendant argues that plaintiff's negligent infliction of emotional distress claim fails as a matter of law because plaintiff cannot establish a genuine issue of material fact that Klaff's acted unreasonably in the termination process.

For the reasons that follow, defendant's motion will be granted as to Counts 5 and 6, and denied as to Counts 1 and 2.

## I. Factual Background[2]

Mr. Dupee began his employment at Klaff's as a security officer in 1995. The

---

1. As defendant notes, plaintiff appears to have misnumbered his Amended Complaint, as it includes Counts 1 through 3 and 5 through 6, but no Count 4. Thus, the only counts remaining, after dismissal of Counts 3 and 5, are Counts 1, 2, and 6.

2. Plaintiff moves to strike the affidavits attached to defendant's motion on grounds that they were not disclosed during discovery and their varies from the witnesses' prior deposition testimony. *See* Mot. to Strike [Doc. # 38]. Preliminarily, and as defendant notes,

duties of Klaff's security guards include "mak[ing] sure all vital locations of the store are covered during the day. This includes the Hardware door area, which must be manned at all times;" "open[ing] doors for customers and be[ing] available to assist customers with packages when necessary;" "walk[ing] through the store checking for shoplifters;" "mak[ing] sure that all merchandise taken by employees is properly signed out;" "accompany[ing] employees and customers to the parking lot when requested to ensure safety;" "driv[ing] the van and pick[ing] up and drop[ping] off both employees and customers according to the schedule;" "mak[ing] sure that the parking lot is for authorized parking only;" and "ensur[ing] that the ... Security Check List is followed when closing the store in the evening." Security Guard Duties [Doc. # 28, Ex. B].

The "Rules and Regulations for Security Dept.," which plaintiff signed, *see* [Doc. # 28, Ex. D], state, *inter alia:* "If you are going to be late for work or not come in to work, you must call in½ hour before starting time and leave a message with personnel dept. Failure to do so will result in disciplinary action or termination.... No guard is to leave the premises unless he gets prior authorization from management,

such as the personnel dept.... Leaving the premises for personal business or errands will not be allowed, unless approved by management, such as the personnel dept. and the time clock must be punched when doing so." Plaintiff also signed a "Receipt of Klaff's Employee Handbook," [Doc. # 28, Ex. E], which Handbook provides the procedures for vacation and sick leave benefits, employee conduct, and attendance and punctuality rules. The Handbook states "SICK LEAVE BENE-FITS ... In the event of an illness or other absence, it is expected that the employee will notify their manager in accordance with company policy. Please refer to the ATTENDANCE policy in this handbook for more information;" "EMPLOY-EE CONDUCT AND WORK RULES The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment ... excessive absenteeism or any other absence without notice ... unauthorized absence from work during the workday;" and "AT-TENDANCE AND PUNCTUALITY ... If you are unable to arrive at work on time or at all you must notify your supervisor directly. Such notification should occur verbally at least 30 minutes prior to the

affidavits appearing to have been created for summary judgment purposes are not required to be disclosed during discovery (as they likely did not exist then) and, additionally, plaintiff had the opportunity to depose these affiants. *See Palma v. Pharmedica Communications, Inc.,* 00CV1128 (AHN), 2002 WL 32093275, at *2 (D.Conn. Mar. 27, 2002). Further, as this Court held in *Ricci v. Destefano,* 04cv1109 JBA, 2006 WL 2666081, at *1 (D.Conn. Sept. 15, 2006), it is inappropriate to strike material contained in exhibits to motions, including declarations and affidavits. As both parties appear to recognize, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony,"

*Bickerstaff v. Vassar College,* 196 F.3d 435, 455 (2d Cir.1999), and, further, Fed.R.Civ.P. 56(e) requires that an affidavit submitted in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein" and evidence that would be inadmissible at trial may not be used to meet plaintiff's burden under Rule 56. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985). The Court bears these principles in mind in its analysis of the summary judgment record. Plaintiff's Motion to Strike will thus be denied.

store opening time (or your given shift's start time)." Employee Handbook [Doc. # 28, Ex. F] at ¶¶ 4.4, 6.1, 6.4.

On January 22, 2003, while making a bank deposit for Klaff's, plaintiff was involved in a motor vehicle accident. On January 24, 2003, plaintiff filed a workers' compensation claim for the accident and he was out from January 23, 2003 to February 25, 2003 due to his injuries. Plaintiff received workers compensation payments while he was out of work. Dupee Dep. [Doc. # 28, Ex. B] at 120–21, 125. Upon his return to work, plaintiff was put on desk duty because he could not drive. Petito Dep. [Doc. # 39, Ex. 8] at 42. The parties agree that after plaintiff's return to work in February 2003, plaintiff periodically had to leave work to attend medical appointments. Defendant contends that it did not have a problem with this, but that it needed plaintiff to provide notice as to when he was going, so that his shift could be covered, and that plaintiff did not always do this and he also would not punch out when he left for his appointments. Petito Aff. [Doc. # 28, Ex. H] ¶ 7; Petito Dep. at 43–44. Defendant also claims that in the couple of years before plaintiff's accident and also following the accident, plaintiff's work performance was "deteriorating," he was not paying attention to his job, he did not want to drive the van in bad weather or sometimes at all, and he would not punch out or give notice when he had to leave for appointments or personal errands. Caceres Aff. [Doc. # 28, Ex. G] ¶ 8; Caceres Dep. [Doc. # 39, Ex. 9] at 30–31; Petito Aff. ¶¶ 4–5; Petito Dep. at 29–30; Heath Dep. [Doc. # 39, Ex. 10] at 63–72. Plaintiff contends, however, that he always contacted his supervisors when he was going to be out and provided doctor's notes for sickness and medical appointments, Dupee Dep. at 61–62, 64, 112, and points to his annual performance appraisals from 1998 through 2003, which gave

him either "very good" or "above average" overall ratings. *See* [Doc. # 39, Ex. 4].

Plaintiff also describes various comments made to him while he was out of work after his accident and when he needed to be absent for doctors appointments. He testifies that while he was out after his accident, Mollie Passero (co-owner of Klaff's) called him and "was very upset about the accident" and told him to "come in to work. Nothing is wrong with you. Come back to work. Nothing is wrong with you. You didn't get hurt, really injured," and she was "quite upset." *Id.* at 103–04. Plaintiff also states that Klaff's general manager, Jeffrey Heath, would swear, yell, and ridicule him in front of customers when he returned from doctor's appointments, for example saying "[t]here's not a doctor that could see you on Saturday," and that plaintiff was "full of shit." *Id.* at 107–11. Plaintiff testifies that he "didn't feel it was right to be yelled and screamed at by Jeff Heath, also with the language, to be embarrassed in front of people," and ultimately plaintiff complained to Mollie Passero, who said she would talk to Health, and to Mollie's daughter, Lisa. *Id.* at 111.

Ultimately, on February 27, 2004, plaintiff was terminated. Disputing plaintiff's claims of illegal conduct, defendant contends that plaintiff was terminated due to his poor work performance, frequent absences without prior notification and/or doctors notes, and, particularly, his unnoticed absences on January 28, 2004, February 11, 2004, and February 21, 2004. Plaintiff does not specifically remember the circumstances of these days, and remembers being on vacation from February 20–27. He reiterates that he always called and provided doctors notes when he was absent. In any event, defendant's Human Resources manager, Juan Caceres, states that once the decision was made to termi-

nate plaintiff, he attempted to contact plaintiff by phone, but was unsuccessful. Caceres Aff. ¶ 10. He testifies that the following week plaintiff was absent from work on Wednesday and Thursday, his "regularly scheduled workdays," and that plaintiff had not requested vacation that week. *Id.* Caceres finally reached him and set up a meeting in his office between 10 a.m. and 11 a.m. on that Saturday, February 27, 2006. Caceres arranged for supervisors Petito and Heath to be present, but when plaintiff did not arrive by 11:15 a.m., Petito and Heath had to leave for other meetings. *Id.* When plaintiff arrived at 11:30 a.m., Caceres told him that he was being terminated. Caceres testifies that the meeting was held in private with no other employees present, that he treated plaintiff "respectfully and conducted the meeting in a professional manner," and that he "had no way of knowing, and certainly did not believe, that Mr. Dupee would suffer any emotional distress from the termination process." *Id.*

Plaintiff, by contrast, testifies that he was not aware of anyone having trouble reaching him, and that when he called Caceres on February 27 to say he would be coming into work (after his vacation), he was told to come to Caceres office and that there would be a change of some kind. Dupee Dep. at 54–55, 57. Plaintiff testifies that after Caceres told him he was terminated, he asked "What are the reasons? Can you tell me?" and Caceres told him "Well, you have had too many doctors appointments." *Id.* at 99. Plaintiff does not dispute that the meeting took place in private and that Caceres was professional and respectful, but contends that he didn't do anything to warrant termination "in this manner," and that he received no warning. *Id.* 133–34.

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Id.* (citations omitted). "If reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal quotation, citation, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an ab-

sence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted).

## III. Discussion

### A. Retaliatory Discharge (Count 1)

Count 1 of plaintiff's Amended Complaint seeks redress for claimed retaliatory discharge in violation of Conn. Gen.Stat. § 31–290a for plaintiff's filing a workers compensation claim. Section 31–290a(a) provides:

> No employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter.

Defendant argues that it is entitled to summary judgment on Count 1 because plaintiff cannot prove a causal link between his filing of a workers compensation claim and his termination. Moreover, defendant claims that even if plaintiff could demonstrate a *prima facie* case of retaliation, it is nevertheless entitled to summary judgment because it has presented a legitimate business reason for plaintiff's termination, *i.e.,* un-noticed absences and deteriorating work performance.

"Connecticut courts often turn to federal law for guidance in setting forth the appropriate burdens of proof in various discrimination/retaliation challenges." *Lane v. Compass Group USA, Inc.,* 05cv579 (EBB), 2005 WL 2710165, at *3 (D.Conn. Oct. 21, 2005) (citing cases). Thus, turning to the Supreme Court's articulation of the burdens and order of presentation proof in cases involving claims of employment discrimination in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. In order to meet this burden, he must present evidence supporting an inference of unlawful discrimination. *See Texas*

*Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff satisfies his *prima facie* case, the burden then shifts to defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action taken. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. The burden then shifts back to the plaintiff to prove that he was discriminated against "either directly by persuading [the jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089.

"To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir. 2002).

### Prima Facie Case

Turning first to plaintiff's *prima facie* case, defendant disputes only the "causal connection" element, by contending that the date of plaintiff's filing of his workers compensation claim is too attenuated from his termination to support an inference of retaliation, and that no other evidence of retaliatory motivation exists.

█ Plaintiff filed his workers compensation claim on January 24, 2003 and was terminated effective February 27, 2004. While this 13–month gap is substantial, it is not too temporally disconnected to support an inference of retaliation. *See, e.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (eight-month gap between filing of EEOC complaint and retaliatory action suggested a causal relationship); *Suggs v. Port Authority of N.Y. & N.J.,* 97civ4026 (RPP), 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (termination six months after plaintiff filed an EEOC charge was "sufficiently close in time to raise an inference of retaliation"); *Bernhardt v. Interbank of N.Y.,* 18 F.Supp.2d 218, 226 (E.D.N.Y.1998) (eleven months between protected activity and termination might suggest causal link where defendant had reasons for delaying termination). This is particularly true in this case where there is other evidence of retaliation, such as evidence that defendant's workers compensation insurance rates (called "experience rating") went up 19% as a result of plaintiff's claim,[3] *see* Petito Dep. at 12–13, which effect would have been felt over the year between plaintiff's filing his claim and his termination thus providing potential retaliatory motivation during that time, and the direct evidence of retaliatory animus in the form of Mollie Passero's anger and demands that plaintiff return to work and insistence that nothing was wrong with him.[4] More-

---

**3.** Plaintiff's other evidence that Klaff's management was upset that its insurance rates went up due to plaintiff's claim, in the form of hearsay evidence from another employee who reported to plaintiff having heard one of Klaff's owners complaining about it, *see* Dupee Dep. at 101–03, cannot support plaintiff's case as it is inadmissible hearsay. *See* note 2, *supra.*

**4.** While Ms. Passero denies making these statements to plaintiff, *see* Passero Aff. ¶ 7 [Doc. # 45, Ex. E], such denials do not, as defendant claims, warrant summary judg-

over, although plaintiff's termination did not occur until 13 months after the filing of his claim, he testifies to other adverse conduct taken against him, including ridicule and harassment by Heath whenever plaintiff needed to be absent for a doctor's appointment, which occurred closer in time to the filing of his claim. *Cf. generally Burlington Northern & Sante Fe Railway Co. v. White,* —— U.S. ——, ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (in order to show an adverse employment action in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). Thus, plaintiff has adduced sufficient evidence to support a causal connection between his filing of a workers compensation claim and his termination.

*Pretext*

■■■■ Defendant has met its burden of producing a legitimate nondiscriminatory reason for plaintiff's termination, citing plaintiff's un-noticed absences, particularly on January 29, February 19, and February 21, 2004, and plaintiff's deteriorating work performance. However, plaintiff has succeeded in adducing evidence sufficient to support an inference that these reasons are pretextual and that the real reason for plaintiff's termination was retaliatory.

As to defendant's claim of deteriorating work performance, plaintiff's performance appraisals belie defendant's contention, as his overall ratings from 1998 through 2003 were consistently either "very good" or "above average." *See* [Doc. # 39, Ex. 4]. Moreover, plaintiff testified that he received no warning of poor performance. As to the claimed un-noticed absences, de-fendant's representatives all testified that they had no problem with plaintiff leaving for doctor's appointments, but just that he had to provide advance notice, *see* Caceres Aff. ¶ 6; Petito Aff. ¶ 7; Petito Dep. at 43–44, and plaintiff testified that he always contacted his supervisors when he was going to be out (for a doctor's appointment or for sick leave) and provided doctor's notes, *see* Dupee Dep. at 61–62, 64, 112. Thus, the issues of whether plaintiff had un-noticed absences and whether defendant terminated him for this reason also remain in dispute to be resolved at trial. Accordingly, defendant's motion for summary judgment on Count 1 will be denied.

## B. FMLA (Count 2)

Count 2 claims defendant violated the FMLA by terminating plaintiff for exercising his right to take FMLA leave on an intermittent basis and by failing to inform him of his FMLA leave entitlement after his accident.

■■■■ The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following: ... Because of a serious heath condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The Act further provides that for such a condition "leave ... may be taken intermittently or on a reduced leave schedule when medically necessary." *Id.* § 2612(b)(1); *accord* 29 C.F.R. § 825.203. Regulations promulgated under the Act define "intermittent leave" as "FMLA leave taken in separate blocks of time due to a single qualifying reason.... There is no limit on the size of an increment of leave when an employee takes intermittent leave or leave on a reduced leave sched-

*ment, but rather create a genuine dispute of material fact for trial.*

ule." 29 C.F.R. § 825.203(a), (d). The Act provides that "[i]t shall be unlawful for any employer to interfere with, retrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); *accord* 29 C.F.R. § 825.220(a). A claim that an employee was "punished" or retaliated against for exercising his or her rights under the FMLA is cognizable as interference with his or her FMLA rights. *Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir.2004).

◼ Because the intent of an employer is material in FMLA interference claims, "the retaliation analysis pursuant to *McDonnell Douglas* is applicable." *Id.* at 168; *Walker v. The Access Agency*, 02cv199 (AHN), 2004 WL 2216526, at *8 (D.Conn. Aug. 31, 2004). To make out a *prima facie* case, a plaintiff "must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. As described above with respect to Count 1, once the plaintiff has made out a *prima facie* case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for its action. If the defendant provides such a reason, the burden shifts back to the plaintiff to provide evidence from which a jury could conclude that the defendant's proffered reason for its action is pretextual and that the real reason for its action was retaliation for plaintiff's exercise of rights protected under the FMLA. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817.

*1. Lack of Notice*

◼ Plaintiff's claim of a FMLA violation arising from defendant's alleged failure to provide him notice of his FMLA entitlement is insufficient to survive summary judgment. The Second Circuit has held that "to the extent that [a plaintiff] contends that the assumed right to notice stands as an independent right under the Act, and that an employee may sue the employer for failure to give notice even if that failure in no way affected the employee's leave, benefits, or reinstatement, we reject that contention. The Act makes it unlawful for the employer to impede an employee's actual or attempted 'exercise' of a right provided under subchapter I. A right to receive notice is not a right that the intended recipient of notice 'exercises.'" *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999).

The record shows that plaintiff took FMLA leave—both full-time leave immediately following his accident and intermittent leave in the form of medical appointments in the year following his return from full-time leave. Plaintiff does not adduce any evidence that lack of notice of his FMLA rights interfered with or prevented him from taking leave. Further, plaintiff does not respond to defendant's argument concerning plaintiff's lack of notice claim nor elaborate on the theory of this claim in his opposition memorandum. Accordingly, summary judgment as to this theory of plaintiff's FMLA claim will be granted.

*2. Termination*

*Prima Facie Case*

◼ Defendant disputes only the "inference of retaliatory intent" element of plaintiff's *prima facie* case. In doing so, defendant observes that plaintiff was not out on FMLA leave when he was terminated and, in any event, there is no evidence supporting an inference of retaliatory conduct.

However, contrary to defendant's contentions, such evidence does appear in the summary judgment record. The record shows that at the point when plaintiff was fired in February 2004, he had taken approximately a month of leave immediately following his accident in early 2003, and had taken "intermittent" leave in the form of absences for medical appointments between his return in February 2003 and his termination in February 2004. While defendant claims that plaintiff did not give adequate notice of all of his intermittent leave, plaintiff disputes this. Additionally, there is evidence that plaintiff was harassed and ridiculed upon returning from his medical appointments, suggesting retaliatory animus. Further, direct evidence of retaliatory action exists in the form of the explanation plaintiff claims Caceres gave when terminating him, that he was being fired because he "had too many doctors appointments." Dupee Dep. at 99. Termination of an employee for exercise of his FMLA rights unequivocally constitutes a violation of the FMLA. 29 U.S.C. § 2615(a)(1).

*Pretext*

■ Plaintiff having adduced evidence sufficient to satisfy his *prima facie* case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for plaintiff's termination, which burden defendant meets as described above by claiming that plaintiff was terminated for un-noticed absences and poor performance. However, as examined above with respect to Count 1, plaintiff has adduced sufficient evidence of pretext to support an inference of retaliatory conduct by reference to his 1998–2003 positive performance evalua-

tions and by his testimony that he always provided notice and doctors notes when he was going to be absent. Plaintiff also claims that he was out on a noticed, approved vacation on the day Klaff's allegedly decided to terminate him for excessive un-excused absences. Additionally, as noted above, there is direct evidence of retaliatory animus for plaintiff having exercised his FMLA rights, as according to plaintiff Caceres told him he was being terminated for "too many doctors appointments."[5] Thus, defendant's motion as to Count 2 must also be denied.

## C. Negligent Infliction of Emotional Distress (Count 6)

Count 6 claims negligent infliction of emotional distress for unreasonable conduct in the termination process "[b]y permitting the plaintiff to take time off for doctor's appointments after his car accident, and then using that time off as a rationale for terminating his employment." Am. Compl. ¶ 36. Plaintiff testifies that he did not do anything to warrant termination in the manner in which he was terminated and that he received no warning, and recounts his depression following termination. Defendant contends that there is no evidence supporting an inference that it acted unreasonably in the termination process.

■ "In order to recover on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or

---

5. Plaintiff's contention that he is entitled to an adverse inference instruction at trial due to defendant's alleged loss or destruction of the doctors notes he provided (*see* Pl. Mot. for Instruction [Doc. # 37] ) will be the subject of a separate ruling and the Court need not consider plaintiff's argument here as even without reflection on the potential effect of such an instruction, there is sufficient evidence for plaintiff to survive summary judgment on his FMLA claim.

bodily harm." *Gomes v. Commercial Union Ins. Co.*, 258 Conn. 603, 619, 783 A.2d 462 (2001) (internal quotation omitted). Thus, a claim for negligent infliction of emotional distress "focuses on the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable." *Cameron v. Saint Francis Hospital & Med. Ctr.*, 56 F.Supp.2d 235, 241 (D.Conn.1999) (internal citation omitted). Courts have expressed concern that the cause of action should "be limited so as not to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." *Montinieri v. S. New England Tel. Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978) (internal quotation omitted). Thus, in the employment context, a tort of negligent infliction of emotional distress arises only where it is based on the unreasonable conduct of the defendant during the termination process. *See Parsons v. United Techs. Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997). "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Id.* at 88–89, 700 A.2d 655.

■ Here, plaintiff's evidence does not support an inference that defendant's conduct was unreasonable. Plaintiff cannot dispute defendant's contention that it tried to contact him as soon as the termination decision had been made (he testifies only that he is unaware of anyone ever having any trouble reaching him), and does not dispute Caceres's testimony that he treated plaintiff in a respectful and professional manner during their conversation. Plaintiff's claim that there was no justification for his termination "in this manner" and that defendant allowed him to take time off for medical appointments and then used those absences as a purported rationale for discharging him are challenges to the reasonableness and fairness of the termination decision itself, not the manner in which it was executed, which is insufficient to support a negligent infliction claim. *See Cameron, supra* (negligent infliction claims "focus[ ] on the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable").

Thus, defendant's motion as to Count 6 will be granted.

## IV. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. # 28] is GRANTED in part, as to plaintiff's Workers Compensation claim (Count 5) and Negligent Infliction of Emotional Distress claim (Count 6), and DENIED in part as to plaintiff's Retaliatory Discharge (Count 1) and FMLA (Count 2) claims. Plaintiff's Motion to Strike [Doc. # 38] is DENIED.

IT IS SO ORDERED.